Jesus Padilla ENRIQUEZ, Raul Franco, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17276.

United States Court of Appeals Ninth Circuit.

Aug. 15, 1961.

David C. Marcus, Los Angeles, Cal., for appellants.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Criminal Division, Edward M. Medvene and Ernest A. Long, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before BARNES, JERTBERG and KOELSCH, Circuit Judges.

BARNES, Circuit Judge.

Appellants were indicted in three counts (III, IV and VII) of a seven count

indictment. Count III charged each with sale and Count IV the concealment of certain narcotics, each in violation of 21 U.S.C.A. § 174 and each occurring on August 2, 1960. Count VII charged each defendant and others with a conspiracy to sell and conceal the same narcotics in violation of 21 U.S.C.A. § 174. The central figure in all seven counts was one Rosalio Hernandez Trigueros, Jr. In the conspiracy count it alleged the object thereof was that Trigueros would arrange to transfer heroin to prospective purchasers, and that the five remaining defendants would supply Trigueros with the needed heroin. The sole overt acts charged against defendants were:

(a) that on August 2, 1960, Enriquez drove coappellant Franco to a meeting where Franco met with codefendant Diaz;

(b) that on August 2, 1960, Enriquez and Franco met with defendant Trigueros in a certain alley.

Prior to trial, defendants Ferrell and Trigueros pleaded guilty to Count I, and defendant Diaz pleaded guilty to Count VII. All defendants went to trial on the remaining counts. Defendant Rose Montez was acquitted; appellants and the other defendants were convicted on all counts.

Jurisdiction below rests on 21 U.S.C.A. § 174; and here on 28 U.S.C. § 1291.

Victor Maria, an undercover agent for the Federal Bureau of Narcotics, purchased narcotics from defendant Trigueros on July 20, 1960. Neither appellant was involved in that sale. We now adopt the government's factual statement of subsequent events; and we assume it represents the view most favorable to the government, which on this appeal we are required to accept as true.

"At approximately 3:35 P.M. on August 2, 1960 Agent Maria met defendant Trigueros at the intersection of Date and Maple, Montebello, California. Trigueros entered the government vehicle and in the ensuing conversation Agent Maria asked Trigueros if he was ready to deliver some heroin. Trigueros replied that he had made arrangements to get some heroin but that the source of supply would be unavailable until 4:30.

"At 4:30 P.M. on August 2, 1960, defendant Diaz joined Trigueros and Agent Maria in the government vehicle. Diaz directed Agent Maria to drive to the Samoan Bar. During the drive to the Samoan Bar, Diaz in discussing the purchase of heroin identified 'Sleepy' as the man they were going to see.

"Upon arrival at the Samoan Bar, Trigueros and Diaz alighted from the government vehicle and walked to the Samoan Bar; shortly thereafter said individuals returned and re-entered the government vehicle.

"Upon re-entering the government vehicle, Diaz stated that 'he wasn't there,' and directed Agent Maria to proceed west on Whittier Boulevard. Diaz further stated that they were to meet 'Sleepy' and mentioned that 'Sleepy' was a cabinet maker who was remodeling a store on Whittier Boulevard. Agent Maria, following Diaz' directions, proceeded to the rear of 4780 Whittier Boulevard, where Trigueros and Diaz left the government vehicle and entered the rear door at said address.

"Approximately thirty minutes later, Trigueros returned to the government vehicle and asked Agent Maria if he knew how to 'cut' heroin. Agent Maria replied affirmatively, and Trigueros stated that if he, Maria, did not cut the heroin, 'they' would and Agent Maria would get 'burnt.' Trigueros then said, 'Wait a minute. We get it ready.' Trigueros was then observed to return to the premises at 4780 Whittier Boulevard.

"At this time, Agent Licuanan left his point of surveillance and walked past the front of the premises at 4780 Whittier Boulevard. As Agent Licuanan passed the store he ob-

served defendants Diaz, Trigueros, Enriquez (Sleepy Padilla) and Franco as well as Augustine Ramirez engaged in conversation in the shop.

"Thirty minutes later Trigueros and Diaz again returned to and entered the government vehicle and directed Agent Maria to the corner of Eastman and Whittier, Montebello, California, where Agent Maria was instructed by Diaz to park the government vehicle. Shortly thereafter, a 1958 Chevrolet Impala drove up and parked near the government vehicle. Agent Maria observed an unidentified male leave the Chevrolet Impala, approach the government vehicle and instructed Diaz and Trigueros that 'the stuff is ready. Get the money and follow me.' The Impala, with the unidentified male following on foot, proceeded to an adjacent alley.

"Agent Maria gave Trigueros $600, Trigueros left the government vehicle and disappeared into the adjacent alley; Diaz remained with Agent Maria. In the ensuing minutes Agent Maria observed the previously identified black Impala drive past the location of the government vehicle on three occasions. Trigueros was observed to be a passenger in the Impala on these occasions. Trigueros then returned to the government vehicle and handed Agent Maria a rubber contraceptive containing a brown powder, Government's Exhibit 2–C."

An unsuccessful attempt to purchase heroin from Trigueros on August 17, 1960, followed. A successful attempt to purchase heroin from Trigueros on August 26, 1960, followed. In neither one of these contacts was either appellant involved.

The evidence hereinabove cited discloses no involvement of either appellant, other than the statement of codefendant Diaz that "Sleepy," (Padilla) was the source of supply, and that on August 2 1960, certain other defendants were in the presence of and had a conversation with appellants. Neither bit of evidence would, we think, be sufficient without more, to sustain the conviction of either defendant.

The government thus must rely primarily on the testimony of one Augustine Ramirez, sixteen years of age and "a third cousin" of the appellant Franco, who worked with defendants doing cabinet work at 4780 Whittier Boulevard on August 2nd, 1960, working out of a cabinet shop located at 4010 Whittier Boulevard in the County of Los Angeles, California. That testimony is as follows, as set forth by the government:

"Sometime between mid-April and July of 1960, appellant Franco and Ramirez had a conversation in Franco's cabinet shop located at 4010 Whittier Boulevard, in which Franco told Ramirez that he would make a 'connection' for 'Jess' (Enriquez) and after that he would not handle the 'stuff' as it was too dangerous. (The word 'stuff' as understood and used by Ramirez referred to heroin.)

"Early in July, 1960, in Franco's cabinet shop, 4010 Whittier Boulevard, Ramirez had a conversation with appellant Enriquez in appellant Franco's presence. Enriquez told Ramirez that if any heroin came in, to put it some place in the shop. On more than one occasion, deliveries of heroin were made to the cabinet shop and Ramirez on each occasion hid the heroin in the shop. Subsequently, Franco and/or Enriquez would inquire as to whether the heroin had been delivered and following Ramirez' 'Yes' answer, Enriquez would go to and pick up the heroin.

"During July and August 1960, Ramirez worked with appellants Franco and Enriquez at 4780 Whittier Boulevard making fixtures for a clothing store not yet open to the public. On occasion, during working hours, Ramirez observed persons enter the premises, speak to Franco or Enriquez and then enter the restroom with Franco or Enriquez. After a brief stay in the restroom

Enriquez or Franco would emerge from the restroom and be observed in the process of putting money in their pockets. At times, after Enriquez visited the restroom, Ramirez observed Enriquez deliver money to Franco.

"On August 2, 1960, Ramirez was working at 4780 Whittier Boulevard with appellants Franco and Enriquez. During the day, Ramirez observed Arnold Diaz and Ross Trigueros enter the store and converse with Franco and Enriquez for a while. After Trigueros and Diaz left the store, Franco instructed Ramirez to accompany Enriquez to Franco's cabinet shop at 4010 Whittier Boulevard, adjacent to Eastman and Whittier. Enriquez and Ramirez proceeded to the cabinet shop in Franco's black 1958 Impala Chevrolet. Near the cabinet shop, on Eastman, Enriquez halted the black Chevrolet Impala and instructed Ramirez to leave the vehicle and tell Trigueros or Diaz that 'the stuff would be ready.' Ramirez told Trigueros that the heroin was ready and walked to the cabinet shop. Enriquez instructed Ramirez to lock up the cabinet shop. Enriquez and Trigueros who had by that time arrived at the shop, departed in Franco's black 1958 Chevrolet Impala. Later, Franco and Enriquez returned to the cabinet shop, picked up Ramirez and took him home.

"Subsequent to action of August 2, 1960, appellants Franco and Ramirez had an argument concerning payment of approximately $135 by Franco to Ramirez. Ramirez stopped working for Franco as a result of the nonpayment of wages. Sometime thereafter, Ramirez again approached Franco requesting payment and was rebuffed.

"Following Franco's refusal, Ramirez said, 'Don't be surprised if anything happens', and Franco replied, 'If anything happens, I am going to kill you.'

"The cross-examination elicited the fact that Ramirez was photographed and fingerprinted by Agent Maria on the date he was initially contacted. (Agent Maria testified this was done because it was apparent that Ramirez knew people in the narcotic traffic and this information would facilitate the relocation of Ramirez if needed); that Ramirez did not know he was to testify until the day before the commencement of the trial on October 25, 1960; and that Ramirez had no revenge motive for testifying in the trial."

■ Appellants' brief does not contain, as our Rule 18, 28 U.S.C., requires, a specification of the errors relied upon. This appeal, therefore, requires no action by us, save to dismiss. We dislike, as does any court, to punish clients for the failures of their attorneys. We will therefore assume the "Topical Index," listing eight points, serves the purpose of specifying the alleged errors.[1] They are as follows:

"Point I The defendants' Motion for Judgment of Acquittal Should have been Granted at the Close of the Government's Case as to Counts 3 and 4 of the Indictment.

"Point II The Defendants' Motion for Acquittal on Count 7, 'Conspiracy', Should Have Been Granted

"Point III The Court erred with Respect to Defendants Franco and Enriquez in Permitting Conversations to be Admitted in Evidence Prior to the Establishment of any Prima Facie Conspiracy, and in Not Striking the Conver-

1. We are further confused by the use of certain language in appellants' brief. We have solved the problem by assuming that appellants' brief uses the word "interpolate" when meaning "interrogate" (p. 13, l. 4; p. 22, l. 1, 3 and 13; p. 79, l. 21) and "intercession" when meaning "interference" (p. 24, l. 16; p. 32, l. 6). Cf. Webster's Unabridged Dictionary, any edition.

sations With Respect to These Names (sic) Defendants and in Permitting Such Evidence to be Considered By the Jury as Binding Upon All Defendants.

"Point IV The Trial Court Committed Prejudicial Error in Permitting the Cross Examination by the Prosecutor of Defendant Enriquez.

"Point V The Prosecutor and Agents of the Narcotics Bureau were Guilty of Prejudicial Misconduct which Denied the Defendants, Franco and Enriquez, due Process of Law, in the Manner in which the testimony of Augustine Ramirez was Secured and Used in the Trial

"Point VI The trial court committed Error Prejudicial to the Rights of the Defendants in its Remarks to Defense Counsel

"Point VII The Court Erred in Denying the Motion for New Trial

"Point VIII The Appellants herein were not Accorded the Regularity and Fairness which should Characterize the Due Administration of Criminal Justice in the Federal Courts."

■ We find no merit in appellants' Points I and II, that the motions for acquittal should have been granted as to either the substantive or conspiracy counts. It is sufficient for us to state, viewing the evidence most favorably to the government, as we must, that we find sufficient questions of fact to have the issue go to the jury, and to support its verdict of conviction. The evidence of Augustine Ramirez if believed, was alone, sufficient for that purpose. We will consider the objections to the admissibility of that testimony later herein.

Appellants' Point III is with respect to (a) permitting conversations of alleged conspirators in evidence prior to the establishment of the conspiracy, and (b) in permitting such evidence to be binding against appellants Franco and Enriquez, and not striking it.

■ This again is primarily and essentially a problem of the proper order of proof, and thus, within the sound judicial discretion of the trial court. Parente v. United States, 9 Cir., 1957, 249 F.2d 752, 754; United States v. Sansone, 2 Cir., 1956, 231 F.2d 887, certiorari denied 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500; Fuentes v. United States, 9 Cir., 1960, 283 F.2d 537; Williams v. United States, 9 Cir., 1961, 289 F.2d 598.

While counsel for appellants Enriquez and Franco moved generally for a judgment of acquittal, based on the lack of evidence to prove the guilt of either defendant, no motion was made to strike any evidence alleged to have been improperly offered or received because of lack of proof that a conspiracy involving such defendants had already been proved. We have already held there was sufficient evidence to go to the jury on all counts. The denial of the general motions acquittal— the only motions made below at the conclusion of all evidence—was proper. There is sufficient evidence here, if it was all properly admitted and believed by the jury, to establish a direct connection and participation by appellants in the sale, concealment and delivery of the narcotics on August 2, 1960.

We find, upon reading of the record, no merit whatsoever, in appellants Point VI with respect to remarks made by the Court during the trial. No cases are cited to support this contention, and the lengthy recital of testimony discloses exactly what appellants describe and no more: a court's impatience with counsel for appellants. The record itself discloses the reason. Whether justified or not, impatience on the part of the court as here demonstrated, is not reversible error.

We find no merit in appellants' first Point VIII—(p. 85 of Brief) (that the sentence imposed on appellants was heavier than that on other defendants.) The peculiar circumstances present in Saldana v. United States, 1961, 365 U.S. 646, 81 S.Ct. 783, 5 L.Ed.2d 855 (reversing 9 Cir., 274 F.2d 352) do not here exist.

We find no merit in appellants' ninth point (second point numbered VIII, p. 89 of Brief). As appellants concede, it is purely a discretionary matter whether a person twenty-one years of age or under is to be sentenced under the Federal Youth's Correction Act, 18 U.S.C. § 5010 (b).

Appellants' Point VII rests on evidence relied upon and referred to under Point V, which we will consider hereafter.

We find error in Point IV, the cross-examination of the defendant Enriquez.

Enriquez took the stand on behalf of defendant Montez (Tr. 454.) His direct testimony was strictly limited, as the transcript discloses:

"By Mr. Arthur (counsel for Montez): Mr. Enriquez—may I ask you, prior—that is, before this trial commenced—had you ever met personally or had you ever heard of a person by the name of Rose Natalie Montez, the defendant in this case? A. No sir, never."

He was then asked twenty-six questions, to four of which objections were sustained. The first two questions relating to his knowing a defendant other than the one mentioned on direct examination, were proper; subsequent questions went far beyond the scope of the direct examination. Tr. p. 457–467.

Appellee admits the general rule to be that "the scope of cross-examination is limited to the factual area covered on the preceding direct examination." Gov. Brief, p. 20. Moyer v. Aetna Life Ins. Co., 3 Cir., 1942, 126 F.2d 141 at 143, citing Philadelphia and Trenton R. R. Co. v. Stimson, 14 Pet. 448, 39 U.S. 448, 10 L.Ed. 535. But the government urges this general rule of cross-examination is "subject to enlargement within the discretion of the trial judge," to show bias or prejudice (Wills v. Russell, 1879, 100 U.S. 621, 625, 25 L.Ed. 607) or to lay a foundation for other evidence, including prior contradictory statements (idem); or to identify the witness with his community, (Alford v. United States, 1931, 282 U.S. 687, 691, 51 S.Ct. 218, 75 L.Ed.

624; 3 Wigmore, Evidence (2d ed.) Sec. 1368 I(1) (b), or to test the truth of the statements made on direct, so as to affect the credibility of a witness, or to show intent. United States v. Manton, 2 Cir., 1939, 107 F.2d 834, 835. Clearly, says the government, the questions asked in cross-examination "would have been properly explored if the prosecution had taken the witness as its own," (Gov. Brief p. 24) citing D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338, 339.

We agree with the government's interpretation of the law, but not that law's applicability to the facts of this case. United States v. Manton, supra, had to do with testing on cross-examination "the truth of the *statements* * * * *made on direct.*" [107 F.2d 845.] (Emphasis added.) D'Aquino, supra, [192 F.2d 369] relates to a defendant "[who] took the stand and undertook to testify upon direct examination concerning * * sundry subjects. She subjected herself to cross-examination on behalf of the prosecution as fully as any other witness in the case," (as the government states) but only with respect to those matters which were within "the proper scope of cross-examination," and which had to do with *intent.*

"Counsel for appellant objected to the cross-examination upon this point on the ground that it was improper as relating to matters that were not touched upon on direct examination of the witness. We think that appellant's contention is based upon a misunderstanding of the proper scope of cross-examination. Appellant had given testimony in her direct examination designed to show both directly and circumstantially her good intent and her lack of intent to betray the United States. Thus, the whole question of appellant's intention was open to inquiry upon cross-examination and the cross-examiner was entitled to bring up for examination any matter which rightly had a bearing upon intent." 192 F.2d 338 at page 370.

And see Bell v. United States, 4 Cir., 1951, 185 F.2d 302, 310; Travis v. United States, 10 Cir., 1959, 269 F.2d 928, 939.

■■ We recognize that the nature and extent of what constitutes proper cross-examination is almost exclusively a matter of discretion with the trial court. We agree that it should be, yet the prosecution cannot have unlimited rights; Blitz v. United States, 153 U.S. 308, 312, 14 S.Ct. 924, 38 L.Ed. 725; and if the questions here asked with respect to other defendants and other activities of the witness and relating to occasions and dates never touched upon on direct examination are permissible, at the very least, a cross-examiner should be required to explain to the court how and why such questions come within the scope of a proper cross-examination, i. e., after objection is made by defendant's counsel, to require the government to make some offer of proof. No explanation was here offered. We see none that could justify the questions asked. Appellee urges that the appellant Enriquez could have been called as the government's own witness, but he was not.

It is true that we find little that might constitute substantial or clearly prejudicial error as a result of the ruling the court made. The witness denied being present at the 4780 Whittier Boulevard address at the time when other witnesses had placed him there. He made no admissions. He denied the alleged conversation with respect to heroin on August 2, 1960, stating he was not in Whittier on that date. Yet we cannot know what influence such apparently innocent answers may have had on the jury.

■ The same error is urged with respect to appellant Franco, who also took the stand to deny he had ever seen, heard of, or spoken to the defendant Montez. He was then cross-examined, though "not to the same extent" as Enriquez. The same observations herein made as to Enriquez' cross-examination are applicable to Franco's appearance and cross-examination. It was also error,

though perhaps not so aggravated, because fewer questions were asked on cross that did not relate to the direct examination. It is true that Raul Franco thereafter took the stand on his own behalf, and testified at some length on cross-examination. This opened much wider the gates through which the government's cross-examination was permitted to pass. But it did not justify questions asked of the defendant Franco as to whether or not he had committed a crime, i. e., stolen clothing of someone on August 19th or 20th, (Tr. p. 580–1). No offer of proof of conviction of a felony was made or suggested. This alone was clearly sufficient to prejudice a jury against Franco, and perhaps Enriquez, and suggests that a reversal of their conviction is required.

When the government has a right to a *limited* cross-examination (which relates to impeachment of the testimony gone into on direct examination, or anything relating to the witnesses' credibility) it is extremely difficult for any trial court to know where the dividing line between proper and improper cross-examination should be fixed. For that reason, if no other, the discretion given to the trial court must be large. Recognizing that, we still find prejudice to each appellant's defense in what here took place, under the peculiar facts of this case, and the limited evidence before the jury as to the participation of the defendants in the sale and possession of the narcotics.

We are thus brought to the last point ―whether the government and its employees were guilty of prejudicial misconduct, denying appellants due process of law "in the manner in which the testimony of Augustine Ramirez was Secured and Used in the Trial."

As appellants twice summarize it in their brief:

"(U)p until five days prior to the trial, Augustine Ramirez had not talked to any government agent or disclosed to any person what he claimed his testimony would be, or what he knew concerning defendants Franco and Enriquez. It is ap-

parent what happened. The trial date was approaching with no evidence against Enriquez and Franco. Agent Maria testified he began looking for Augustine Ramirez and did not locate him until the 21st day of October, 1960, some days before the trial. He took him to the Federal Narcotics Bureau and fingerprinted him, mugged him, refreshed his memory, and then produced him at the trial four days later as a witness."

We have carefully read the testimony and have particularly noted the wide latitude the trial judge permitted counsel for appellants in probing into any possible bias, prejudice, desire for revenge, untruthfulness, or inconsistencies on the part of Ramirez.

We find ourselves not completely satisfied that the appellants received a fair trial. Counsel for appellants contents himself with reciting the facts, and then *concludes*, "the manner in which this testimony of Ramirez was secured, elicited and presented to the jury constituted a denial of due process of law." While we cannot agree with this, we do believe the lack of evidence as to the defendant's participation with admittedly guilty defendants in Narcotics Act violations, other than the testimony of the sixteen-year-old witness, makes the government's improper cross-examination of the defendants reversible, rather than harmless, error. The same questioning under a different state of facts, might be considered error, but harmless. Here we cannot in good conscience so hold.

The judgment of conviction as to each defendant is *Reversed*, as to each count.

■ Because these defendants may be tried again, we add the following comment: Appellants urge a second specific error in the asking of a question relating to "stuff" Martinez had said was in the appellants' shop: "When you speak of 'stuff', Mr. Ramirez, what are you referring to?" Answer: "Heroin." Tr. 250, Par. 2–4. Appellants' counsel moved to strike the answer. This motion was denied, and this is claimed prejudicial error. Say appellants, "Here was a sixteen-year-old youth giving an answer that only an expert forensic chemist could give. It was the gist and heart of the case."

Counsel misunderstands the purpose of the question. Ramirez was not asked as an expert whether the substance he saw was actually heroin. If that had been the only testimony as to what substance introduced in evidence within the envelopes marked Exhibits 1–C, 2–C and 3–C actually was, appellants' point would have been well taken.[2] Ramirez was asked what he "meant" (i. e., what he was referring to) by use of the word "stuff." In answer, he stated heroin. The same rule of evidence would have applied had a witness referred to a "reefer" or "H." What did the witness mean? He alone could say. Cf. Parente v. United States, 9 Cir., 1957, 249 F.2d 752, 756; Batsell v. United States, 8 Cir., 1954, 217 F.2d 257, 262.

There is no question but that the argot of drug addiction contains many strange terms. The trial judge below, however, could not have been on the Federal Criminal Bench in California a month before learning that "stuff" is a well-recognized synonym for narcotics of one type or another, usually heroin or some other opium derivative. There was no error in permitting this question and answer.

2. As a matter of fact, counsel for all defendants stipulated the substance contained within envelopes marked Exhibits 1–C, 2–C and 3–C, was heroin. As to 1–C, when received by the government chemist in envelope marked Exhibit 1–B, it was twenty-six and one-half per cent heroin, 2–C when received was forty-four and one-half per cent heroin, and 3–C was twelve and seven-tenths per cent heroin. The balance was procaine or novocaine. Tr. p. 129 and Brief.