Jesus Padilla ENRIQUEZ and Raul Franco, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17928.

United States Court of Appeals Ninth Circuit.

March 4, 1963.

See also 293 F.2d 788.

David C. Marcus, Los Angeles, Cal., for appellants.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Crim. Section, and Russell R. Hermann, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and JERTBERG, Circuit Judges, and FOLEY, District Judge.*

* Honorable ROGER D. FOLEY, United States District Judge for the District of Nevada, sitting with this Court by designation.

BARNES, Circuit Judge.

This is the second appeal before us in the above entitled matter.

Originally there were seven defendants charged in a seven count indictment. Defendants Enriquez and Franco were charged in Count III with sale and in Count IV with the concealment and transportation, or facilitating the concealment or transportation, of narcotics; and in Count VII were charged with other defendants of a conspiracy to sell and conceal the same narcotics. (21 U.S.C. § 174.) As we noted in our previous opinion (9 Cir., 293 F.2d 788), the central figure, one Trigueros, was charged in all seven counts. Prior to the first trial, Trigueros pleaded guilty to Count I along with defendant Farrell. Defendant Diaz pleaded guilty to the conspiracy count. Defendant Rose Montez was acquitted. Jurisdiction of the district court rested upon 21 U.S.C. § 174, and rests here upon 28 U.S.C. § 1291.

On this trial, the trial judge dismissed the conspiracy count at the conclusion of the government's case, and the jury found each appealing defendant innocent of selling, but guilty of the facilitating count (IV), on August 2, 1960.

In our previous opinion we quoted the evidence at some length in order to show that proof the defendants now appealing participated in any manner in one of the three alleged sales of narcotics rested almost entirely upon the testimony of the witness Ramirez, a sixteen-year-old boy. Other than the facts:

(1) that Franco was the owner of one of the cars seen at the site of the sale of narcotics on August 2, 1960;

(2) that the defendants Diaz and Trigueros had a conversation in the presence of the narcotics agent, Maria, and the special employee, Barnes, in which two words were heard and recognized ("connection" and "sleepy",[1] the latter being Enriquez' nickname);

(3) that Trigueros, Diaz, Franco and Enriquez had been seen in certain conversations, contents unreported, at the remodeled store premises at 4780 Whittier Boulevard in Los Angeles, California, prior to one of the sales;

(4) that Enriquez had been identified as the driver of one of the cars which participated in the transaction of August 2, 1960.

there was no evidence corroborating Ramirez' testimony and bringing the two appealing defendants into the case. There was no testimony that on August 2, 1960, there were any narcotics on the premises of defendant Franco's cabinet shop at 4010 Whittier Boulevard, or on the premises where he was working, 4780 Whittier Boulevard, or that any money passed at either place. There is testimony that Enriquez drove a car to which money was delivered (to another person), and that from said car another person threw narcotics. Thus while there was no proof of actual possession, direct or inferential, there was a question whether or not the appealing defendant Enriquez did have constructive possession through the exercise of some dominion over the narcotics in the physical possession of some unknown person in Franco's car, driven by Enriquez on the night of August 2, 1960.

In our previous opinion we summarized the evidence, as had been done in the government's brief in a manner which we assume was the most favorable to it when it sought to support the judgment of conviction. We stated there was sufficient evidence to convict, but reversed the judgment obtained at the first trial upon the ground of procedural error in the introduction of evidence.

Coming to the appeal that is now before us, we feel we are required, because of our ultimate conclusions, to note that

---

[1]. This conversation was partly in Spanish and partly in English, and the two words noted were the only ones "recognized" by the witness Maria. This conversation did not take place in the presence of either defendant.

the following matters took place at this trial which make it factually different from the first trial:

(A) At the start of the trial the government stated it would not offer any evidence as to overt acts three and five, contained in Count VII, the conspiracy count. These were the only overt acts charged against the defendant Franco or Enriquez, or either of them. The court thereupon declined to read the overt acts three and five to the jury, and instructed the jury: "They [overt acts three and five] are withdrawn. The jury will understand that they are not to be considered and that they are not before you." (Tr. 93.)

Despite the fact that no overt acts were charged against the defendants, or either of them, the government did not dismiss the conspiracy charge, but proceeded to trial on it.

After the trial judge announced that he would take the conspiracy count away from the jury and ask the jury to consider substantive Counts III and IV only, and permitting them to determine if there was a common scheme or plan between these two defendants, and others, counsel for the government immediately stated: "I have no objection, your Honor." (Tr. 496.)

■ The date of the alleged conspiracy was from July 20th to August 29th, 1960. The government proceeded to have its witnesses relate conversations between Maria and Trigueros and others out of the presence of the appealing defendants. Timely, well founded and continuing objections were made on the ground a conspiracy had not been established, and that the conversations were then hearsay as to the two objecting defendants. The questions were permitted to be answered, subject to a later motion to strike. Similar conversations were offered, objected to, and permitted in evidence with respect to incidents occurring on July 27th and August 1st, 1960, as well as a conversation on August 2, 1960, prior to the time of day that the officers allegedly met the defendants Enriquez and Franco, and conversations taking place on August 17, 1960 and August 26, 1960, all outside the appellants' presence. Thus, six conversations relating to the narcotics trade were gone into before the jury, over timely objection and with the continued admonition of the trial judge that he would strike such testimony from the record should the conspiracy not be proved, or any agency or common scheme developed. The trial judge's rulings, of course, were perfectly proper, as we pointed out in our previous opinion, due to the large discretion permitted the trial court in permitting proof of an alleged conspiracy, and the order of proof of its necessary parts.

■ At the conclusion of the plaintiff's case, the proof of the conspiracy had not been developed by the government; the defendants now appealing were not proved to have been part of any conspiracy, and the trial judge (and again very properly) granted the appealing defendants' motion to dismiss the conspiracy count, and, as we read the record, struck the evidence of the six various conversations from the record and admonished the jury they should disregard such testimony.[2]

(B) Unlike the first trial, the jury in the second trial failed to convict the appealing defendants on Counts III and VII, but did convict them on Count IV, i. e., transporting and concealing, or facilitating the transportation or concealment, of narcotics.

2. The record is not at all times clear as to precisely what was stricken. At page 505 of the Transcript, the trial judge ordered struck: "All evidence as to any acts or conduct or transactions prior to August 2, 1960, and subsequent to August 2, 1960, except as to the testimony of witness Ramirez."

No specific reference was here made to Maria's testimony as to *conversations* occurring prior to August 2, 1960.

On page 507, however, "anything in Maria's testimony" before the 2nd of August and after that time was included as stricken. And on page 508, specific reference was made to the striking of Maria's conversations.

(C) While there is not the slightest evidence that either appealing defendant at any time had actual or physical possession of any heroin introduced into evidence, or any narcotics connected with the sale of August 2, 1960, the preceding sale of July 20, 1960, or the subsequent sale of August 26, 1960, there was introduced into evidence through the testimony of the boy, Ramirez (a) much testimony concerning the use by these appealing defendants of marihuana "about five times" during the months of June and July 1960, and (b) possession of heroin during the same two months by the appealing defendants at their place of business, the cabinet shop, located at 4010 Whittier Boulevard.[3] Such evidence was introduced, over objection, on the issue of intent,[4] i. e., proof of the possession of drugs on occasions other than those named in the substantive counts to show the possession to be subsequently proved would not wholly be unintentional or accidental.

The trial court admonished the jury:

"The government can't prove * * * the man committed an offense on Wednesday by proving he committed it on Sunday. That isn't what these defendants are charged with. They are charged with committing offenses in July and August.

"Now, the two heroin offenses charged in Counts 3 and 4 apparently relate to the same amount of heroin on the same date of August 2, 1960; and the conspiracy charge is alleged to have been begun on or about July 20, 1960, and continued until August 29, 1960. So this evidence deals with alleged conduct prior to anything charged in the indictment. So in considering it you must first lay all this evidence aside and consider, has the Government established beyond all reasonable doubt * * * by other evidence that these defendants did the acts charged in any one of the counts of this indictment. If you determine from the other evidence in the case beyond a reasonable doubt that these defendants have so done those acts, then in determining the state of mind or intent with which they did those acts, you may consider evidence as to earlier acts of a similar or like nature to negative the mistake, show it wasn't a mistake—if they erred, they knew what they were doing—to show the intent or state of mind with which the acts were done." (Tr. 314.)

All evidence as to the prior possession of marihuana (on several occasions) and heroin (on one occasion) was likewise received subject to a motion to strike.[5] Without presently reaching the question whether proof of the prior use of a *marihuana* cigarette is admissible to show intent to facilitate the sale or concealment of *heroin*, we will first consider additional points peculiar to the second trial.

(D) Although the principal witness, Trigueros, was indeed not a completely cooperative or willing witness for the government on the second trial, nevertheless his testimony must be assessed on precisely what he did testify to. He testified that when he went to the Men's Shop at 4780 Whittier Boulevard, August 2, 1960, he spoke to but *one* person.[6]

---

3. This is not to be confused with Teddy's Men's Shop, the shop owned by Teddy Rivas which was located at 4780 Whittier Boulevard, and which was allegedly being remodeled by the defendants Enriquez and Franco during the time of the alleged conspiracy, and where the unheard and unspecified conversations of August 2, 1960 between Trigueros, Diaz, Franco and Enriquez took place.

4. Tr. 309.

5. Tr. 316.

6. Tr. 236:
"Q. Were you dealing with one or more persons inside?
* * * * *
"[objection]
* * * * *
"Q. * * * You stated you had a conversation with some persons in there regarding heroin, is that correct?
"A. That is correct.
"The Court: One or more? One or more? Who was there? Who was present? What was said? * * *

Thus it is impossible, on Trigueros' testimony alone, to establish that he had conversations in the store on August 2, 1960, with *both* of the defendants or either one of them. Neither government counsel [7] nor defense counsel asked the witness who the individual was with whom he had the conversation on August 2, 1960, relative to the obtaining of narcotics. Further, on cross-examination (Tr. 254), the witness Trigueros stated that he did not see either appealing defendant in the Whittier Boulevard store at the time that he went there on August 2, 1960; nor did he talk to either one of said defendants about narcotics.[8]

It was also true that Mr. Trigueros when asked to identify Augustine Ramirez as the person who had come up to his car on August 2, 1960, after leaving the store on Whittier Boulevard, in order to advise him that the "stuff" was ready, denied he had ever seen Ramirez before. Trigueros represented that the person who got out of the car was short, stocky, 26, 27 or 28 years of age, weighing 150 to 160 pounds. In the Government's Exhibit 4,[9] constituting the statement of Ross Trigueros taken September 30, 1960,

in the Sheriff's Office at the Hall of Justice, he stated, with regard to any conversation in the store at 4780 Whittier Boulevard on August 2, 1960, merely that "We [Diaz and Trigueros] talked to a guy." On the occasion of the two other purchases, Trigueros testified that he obtained the heroin from Joe R. Farrell, one of the defendants who had pleaded guilty at the time of the original trial.

In the memorandum report of the Bureau of Narcotics,[10] the unidentified male who allegedly got out of the automobile to tell Trigueros that the "stuff" was ready, is described as "a male of Mexican extraction, about 5′ 7″ tall, 140 pounds, medium build, about 25 years old."

(E) One of the matters which markedly differed on an essential point in the two trials was the testimony of Agent Maria. At the first trial, Maria could not "positively" identify the driver of the 1958 Chevrolet Impala (black in color), the car the defendant Ramirez testified Enriquez drove and he (Ramirez) got out of in order to contact Trigueros.[11] At the second trial, Agent Maria could and did identify Enriquez

---

"Mr. Osborne [for the government]: I have a very specific reason for asking the type of questions I am.

\* \* \* \* \*

"Q. Was it one or more persons with whom you conversed inside the store?

"A. One person.

"Q. One only?

"A. Yes.

"Q. Your entire conversation, yours and Diaz', was with only one person?

"A. Yes."

7. As quoted above, this omission was apparently intentional.

8. Tr. pp. 254–255:
"One of the defendants I've seen only once for a few minutes. The other one I never seen before, other than in court.

"Q. Where did you see Mr. Enriquez before?

"A. I think it was at a wedding. I was introduced to him.

"Q. And that is your only acquaintance?

"A. That's right.

"Q. With Mr. Enriquez?

"A. Yes.

"Q. Did you tell that to Mr. Maria?

"A. Yes. He knows that.

"Q. Did you tell him at that time?

"A. Yes.

"Q. Did he at any time suggest to you that you identify these two boys as being in the store?

\* \* \* \* \*

"The Witness: Yes. Several times.

"MR. MARCUS.

"Q. What did he say to you?

"A. That if these were the fellows that were in there.

"Q. What did you say?

"A. I told him no."

9. Marked for identification only, and never introduced, but used generously for alleged impeaching purposes.

10. Marked 5–B for identification only, but again used on cross-examination for alleged impeachment purposes.

11. Transcript, first trial, p. 169; second trial, p. 142:
"The Court: Do you know who the male was, the person you referred to as 'a male', who was driving the other automobile?

with positiveness. He explained the difference in his testimony.[12]

"The Witness [Maria]: Not * * * I saw him as he passed. I didn't get a good enough look to positively identify him myself, your Honor * * *."
And, as to his second view of the car:
"Q. And were you able, or are you able now to identify who was in that car?
"A. As far as giving a positive identification, I can identify one of the defendants, one of the people in that car, and the other I can't.

⁕      *      *      *      *

"Q. And the one you can identify of course, is the defendant Trigueros, isn't that right?
"A. Yes, I could identify Trigueros."

12. Transcript, p. 139, *l.* 17 to p. 145, *l.* 5:
"Q. * * * Did you see a '58 Impala circling that area?
"A. Yes, I did.
"Q. How many times did you see it during the forty-five minutes that you were there?
"A. Three or four.
"Q. And who was driving that car?
"A. Mr.—the defendant Enriquez.
"Q. And how many times did you see him drive that car?
"A. I saw him when he pulled up the first time in front of my car. I got a look at the defendant. The other times the person driving the car appeared to be the same as the person that drove it to my vehicle and stopped.
"MR. MARCUS: Your Honor, may I now approach the witness?
"THE COURT: Yes. Do you have an extra copy of——
"MR. MARCUS: This is a copy.
"THE COURT: Do you have an extra copy?
"MR. OSBORNE: I have a copy, your Honor.
"THE COURT: You don't have a third copy?
"MR. OSBORNE: No sir.
"THE COURT: Very well. Place it before the witness.
"(Whereupon the document was placed before the witness).
"THE COURT: Now, if you will just call his attention to page——
"MR. MARCUS: 203.
"THE COURT:——so-and-so, and line so-and-so, to place it before him, and let him read it. Let him read it to himself.
"And tell us when you are finished reading it to yourself.
"Now, lines what?
"MR. MARCUS: Beginning on line 19

(F) Another matter new at the second trial was the testimony of the witness of page 203, to page 204, line 3.
"THE COURT: Now, read that, Mr. Maria, to yourself, and tell us when you have finished reading it to yourself. Then return the transcript to Mr. Marcus.
"(Witness complies.)
"MR. MARCUS: I will ask you whether or not on August——
"THE COURT: Go back to the lectern, Mr. Marcus, so we can all hear you better.
"MR. MARCUS: Your Honor, I will have to approach him again in just a minute.
"THE COURT: Let him read all you want him to read, then you may ask him if he so testified, and read it into the record, if you like.
"MR. MARCUS: I will do that, sir.
"Page 169, sir, of the trial proceedings had on October 26, 1960, before this court, beginning on line 7, to and including line 12.
"(Witness reading.)
"BY MR. MARCUS:
"Q. I will ask you, sir, whether you were asked those questions, and did you make those replies?
"A. Yes, I did.
"MR. MARCUS: May I, with the court's permission, read it now?
"THE COURT: Yes. Tell us which one you are reading so we will know.
"MR. MARCUS: I was just going to mention it, your Honor.
"At page 169, this is a question——
"THE COURT: This is the second one you asked him to read?
"MR. MARCUS: That is correct.
"You were asked.
"The Court: Do you know who the male was, the person you referred to as 'a male,' who was driving this other automobile?
"The Witness: Not—I saw him as he passed. I didn't get a good enough look to positively identify him myself, your Honor.

*      *      *      *      *

"Q. (By Mr. Arthur) And on what date did you see that car?
"A. On August 2, 1960.
"Q. And that was a date of a purchase of narcotics, is that correct?
"A. It was, yes.
"Q. And were you able, or are you able now to identify who was in that car?
"A. As far as giving a positive identification, I can identify one of the defendants, one of the people in that car, and the other I can't.
"THE COURT: The first was 'can'?

Byram, a Government Agent. Byram testified he observed the two men who had left Agent Maria's Car (Trigueros and Diaz) talking to a third man. "There was a fourth man in the store whom I could not see clearly. I can say there were four men in the store, there may have been others." He could identify the man to whom the two agents were talking as Raul Franco. He observed them in conversation for several minutes.[13] Byram also identified Enriquez as the driver of the 1958 Impala at the August 2, 1960 transaction, in

"MR. MARCUS: 'I can identify one.'

"THE COURT: 'can' without the 't' on it?

"MR. MARCUS: That is right.

"THE COURT: C-a-n.

"MR. MARCUS: C-a-n.

"Q. And the one that you can identify, of course, is the defendant Trigueros, isn't that right?

"A. Yes. I could identify Trigueros.

"BY MR. MARCUS:

"Q. Now, sir, are you sure now that you saw the defendant Enriquez in that car?

"THE COURT: What car? The Chevrolet Impala?

"MR. MARCUS: The Chevrolet Impala on August the 2nd of 1960, drive by that place where you were parked.

"THE WITNESS: The first time——

"THE COURT: The question is, are you sure?

"THE WITNESS: Yes.

"THE COURT: You may explain it if you wish.

"THE WITNESS: The first time I saw that car pull up alongside of mine——

"THE COURT: 'That car' being the Chevrolet Impala?

"THE WITNESS: The Chevrolet Impala. I was seated in the passenger side of my car directly opposite the passenger of the '58 Impala. I took a quick glance at the driver of that vehicle. I believed it to be—at that time I believed it to be Mr. Enriquez, who I knew as 'Sleepy' Padilla.

"The other times that car passed the area the only one I could recognize was Ross Trigueros. I could not identify the driver of this car. I could not positively identify the driver of that car when it was beside my car. The first question I asked when I met with the other agents was, 'Was Sleepy driving? Was Sleepy driving the '58 Impala?' The answer I received was yes.

"BY MR. MARCUS:

"Q. Now, sir, when did you meet with the agents when you asked that question? What was the date?

"A. The same day, August 2nd.

"Q. But you testified in this courtroom, did you not, on October the 26th, some four months afterwards?

"A. October 26th?

"Q. Yes, sir.

"A. Yes, that's right, during the trial.

"Q. And at that time you had knowledge, or had been informed by the agents and you knew in your own mind that Enriquez was in that car on that day?

"A. As I said, I could not positively identify him when he parked next to mine. I got a glimpse of him. I thought it was him. I could not positively identify him.

"Q. That is your explanation for your testimony on October 26th, is that correct?

"A. Yes."

Transcript, p. 262, l. 19 to p. 263, l. 19:

"Q. When you prepared this report, sir, on August the 3rd, your recollection of the events that took place on August the 2nd, and your identification of the person that approached the car, was better than it is today, is it not?

"THE COURT: You mean by that, did he have a better mental picture of the person then than he has today?

"MR. MARCUS: Yes.

"THE WITNESS: The description I have outlined in paragraph 13——

"THE COURT: That isn't the question. The question is, did you have a better mental picture of that person on August 3rd than you have today?

"THE WITNESS: Yes, I do, I believe I did.

"BY MR. MARCUS:

"Q. The person that you saw come up to the car was not sixteen or seventeen years of age, was he?

"THE COURT: You mean, did he appear to be?

"BY MR. MARCUS:

"Q. Did he appear to be?

"A. It must have appeared to be, for that is what I have put down in my report.

"THE COURT: You put down 25 years?

"THE WITNESS: Yes, sir, about 25 years.

"THE COURT: Is that what he appeared to you at that time?

"THE WITNESS: Yes, sir."

---

13. Tr. 267.

which four automobiles were involved: the 1958 Impala, a 1960 Chevrolet, an "old" Cadillac, and the government agents' car.[14]

(G) We come next to the testimony of the witness Ramirez. We adopt as an accurate summary, most favorable to the government, the matters set forth on pages 7 to 9 of the appellee's brief.[15] They do not include the following statement of facts taken from the previous opinion, which in turn was taken from the government's brief at the first trial:

" 'Subsequent to action of August 2, 1960, appellants Franco and Ramirez had an argument concerning payment of approximately $135 by Franco to Ramirez. Ramirez stopped working for Franco as a result of the nonpayment of wages. Sometime thereafter, Ramirez again approached Franco requesting payment and was rebuffed.

" 'Following Franco's refusal, Ramirez said, "Don't be surprised if anything happens", and Franco replied, "If anything happens, I am going to kill you."

" 'The cross-examination elicited the fact that Ramirez was photographed and fingerprinted by Agent Maria on the date he was initially contacted (Agent Maria testified this was done because it ,was apparent that Ramirez knew people in the narcotic traffic and this information would facilitate the relocation of Ramirez if needed); that Ramirez did not know he was to testify until the day before the commencement of the trial on October 25, 1960; and that Ramirez had no revenge motive for testifying in the trial.' " (293 F.2d 788 at 791.)

Appellants strenuously urge as one of their grounds of error that the government was guilty of prejudicial misconduct by the manner in which it procured the testimony of Augustine Ramirez. This was urged at both trials.

---

14. Tr. 270.

15. "The next witness was Augustine Ramirez who testified that during the time in question he was employed by the appellants who owned a cabinet shop on Whittier Boulevard and were engaged in remodeling a store at 4780 Whittier Boulevard. He testified that all three of them, including Franco, Enriquez and himself, were occupied by doing remodeling work in that store. Enriquez's nickname was 'Sleepy' Enriquez. After testifying that he had been shown heroin and marihuana in his science class at school Ramirez testified that he saw what appeared to him to be marihuana at the cabinet shop at 4010 Whittier Boulevard in the hands of Raul Franco. During the reception of this evidence the judge very carefully instructed that the evidence only went to intent and state of mind and could only be used to determine state of mind once the acts charged in the indictment were proved. Ramirez stated the substance appeared like the marihuana he saw at school. He testified that he saw marihuana on the premises of the cabinet shop on several occasions in June and July and that he observed it being smoked, by Enriquez and Franco, and that he also saw them smoke it at 4780 Whittier Boulevard. He also testified that in July of 1960, he twice saw Trigueros and Diaz come to the store and leave with some marihuana cigarettes they bought from Franco and Enriquez.

"Ramirez also testified that he saw what happened to be heroin at the cabinet shop in July of 1960. He said that Enriquez, in the presence of Franco, told him a man would bring in a package and for him to hide it, and that a man did bring in a package which Ramirez examined and found to contain a whitish powder in a rubber balloon. Next Ramirez testified as to the events which took place on August 2, 1960, stating he saw Ross Trigueros and Arnold Diaz leave the store being remodeled at 4780 Whittier Boulevard and saw them talk to both Franco and Enriquez and that nobody else other than himself was in the store that he could recall. After that conversation Franco told him to go with Enriquez in Franco's car, a 1958 Impala. They drove to Whittier and Eastman where Enriquez told Ramirez to get out and tell Trigueros the 'stuff' was ready. He did so, Trigueros being seated in a car. He then walked up an alley toward the cabinet shop and was passed by Trigueros and he saw Trigueros and Enriquez drive off together. Later Franco and Enriquez came together in an Impala and rejoined Ramirez."

One of the important matters which was omitted in the government's resume of Ramirez' testimony on this appeal was with respect to evidence admitted to show the defendants' intent; that a specific transaction in marihuana occurred in July 1960, when Diaz and Trigueros allegedly took marihuana cigarettes from the store; a second time when the same thing happened, that is, the same two left with marihuana; the fact that Ramirez had seen heroin during the month of July 1960 in the store at 4010 Whittier Boulevard.

At the first trial, Ramirez testified:

" 'Enriquez told Ramirez that if any heroin came in, to put it some place in the shop. On *more than one* occasion, deliveries of heroin were made to the cabinet shop and Ramirez on *each* occasion hid the heroin in the shop.' " (Previous opinion, 293 F.2d 788 at 790. Emphasis added.)

At the second trial, the witness Ramirez testified that prior to the time that he had been handed some heroin by "some man" unknown to the witness, Enriquez had not discussed the matter of heroin with Ramirez. This apparently caught government counsel by surprise (Tr. 331) and the same question was asked again (Tr. 332), then the following question was asked:

"Following that [first transaction], did you ever again see heroin on the premises at 4010 Whittier Boulevard?

" * * * [Objection. The court rephrased the question.]

"What appeared to be heroin?"

"A. That is the only time I seen heroin delivered there.

"The Court: This one time?

"The Witness: Yes. * * * I'd say the middle of the month of July." (Tr. 335.)

(H) As rebuttal testimony in the instant case, defendants introduced evidence that the witness Augustine Ramirez had been paid for a full week's work on a new job, commencing August 1, 1960, and argued that he could not have been present on August 2, 1960, at the time he claims he was.[16] This, the court very properly ruled, was a disputed fact for the jury to determine, and we cannot hold that this was anything other than a question of fact for the jury to determine: whether Ramirez was telling the truth as to what happened on August 2, 1960, or whether he was in fact working somewhere else. The verdict of the jury finding the defendants guilty on the one count of concealing, and not guilty of the count of sale does not indicate with certainty whether they paid a great deal or very little or any attention to this testimony of Ramirez.

(I) On the first appeal, with respect to appellants' point three, (having to do with alleged conversations of conspirators being permitted in evidence prior to the establishment of a conspiracy, and in permitting such testimony to be binding upon the defendants prior to the proof of any conspiracy) we pointed out that this was primarily and essentially a problem of the proper order of proof, and thus within the sound judicial discretion of the trial court. We also pointed out, that while counsel for the appellants in the first case moved generally for a judgment of acquittal, based on the lack of evidence to prove the guilt of each defendant, no motion was made to strike any evidence alleged to have been offered or received because of lack of proof the conspiracy involving such defendants had

16. The restaurant where Ramirez was working was "Alex's" located on the northwest corner of Hicks and Union Pacific Avenue in Los Angeles.

The witness, Alex Manahan, was the owner thereof, and testified that Augustine Ramirez worked on Monday, Tuesday and Wednesday of the first week of August, 1960, from 5:00 to 8:00 P.M., even though his brother was working there earlier during the day, holding the job for Augustine Ramirez. Augustine was the principal witness against these appellants. David Ramirez was the older brother.

already been proved, and there thus had been a waiver of this point.

At the second trial, counsel for appellants corrected this error and made the necessary motions. The record now before us is thus essentially different than it was at the time of the first appeal.

Having covered the important differences between the record on the two appeals, we will discuss appellants' various claims of error.

## I

■■ We again, on this appeal, state that the manner in which the witness Augustine Ramirez was located, five days before the first trial, brought to the Federal Building by Federal officials, threatened with the fact that he might be sentenced to jail for a five year jail term, fingerprinted and a mug shot taken, was not a deprivation of due process, so far as either of the appealing defendants are concerned. The government officers testified as to why they followed this procedure, and while we feel that it might well raise an inference that the testimony of Augustine Ramirez was unduly influenced by the government's representatives, particularly in view of some telling changes in his testimony, as well as discrepancies in his testimony between the two trials, as noted above, nevertheless we are satisfied that it was a matter within the sound discretion of the trial jury to determine whether the witness in fact testified voluntarily, and whether he was or was not to be believed. We will not disturb that determination.

## II

■ Nor can we agree with appellants that they were not accorded the regular-

ity and fairness from the trial judge which characterizes the due administration of justice in the Federal courts. The statement the trial judge made after hearing evidence at the second trial that he "had not the slightest doubt of the guilt of these defendants" was not an improper thing to say on motion for new trial.[17] The trial judge is to be complimented on the fact that, feeling as he did (and not considering certain rulings on evidence), he gave the defendants a fair and impartial trial. We find no merit in this contention of appellants that the trial judge was unfair.

## III

We finally come to the defendants' first, third and fourth points which are basically but one, and which have merit. They are: the admission of testimony regarding prior use of, and transactions in, marihuana and heroin; subsequent transactions involving heroin; evidence of the presence of marihuana and heroin on the defendants' business premises; the failure of the trial judge on proper motion to strike such evidence; and the refusal of the trial court to grant an acquittal at the close of the government's case.

■■ There is no question but that on the limited issue of intent, it is not error to permit the introduction of evidence as to the prior possession of heroin by any defendant charged with possession, transportation or sale of heroin, or facilitating such possession, transportation or sale. But prior possession of heroin related only to Enriquez,[18] and there was testimony that this occurred but once.[19] This is true, even though his

17. The trial court continued: "There never was in my mind, after the first trial, but apparently you have convinced the Court of Appeals that Augustine Ramirez was an irresponsible sixteen year old boy. * * * If the Court of Appeals wants to reverse it, let them reverse it. They can reverse and we'll try it again. There is not only not a reasonable doubt, but there is not the slightest doubt in my mind of the

guilt of both of these defendants." (Tr. 778).

18. Tr. 333. While Ramirez stated Franco was present when he (Ramirez) discussed the heroin with Enriquez, the conversation was merely to the effect: "If a package arrived, just to get it and hide it someplace in the shop." No mention of heroin was made.

19. Tr. 335. On the first trial, Ramirez testified to several deliveries of heroin.

alleged possession was prior to the date of the alleged conspiracy.

But is testimony of previous *possession* or *use* of *marihuana* admissible to show intent *to sell* heroin, even though proof of previous *sale* of marihuana *might* be? Heroin was the only narcotic involved in the charges against the defendants. Yet counsel for the government intentionally *first* asked about previous possession of marihuana, and protested when the court properly questioned the witness as to any previous possession of heroin, not marihuana.[20] No proffer for the limited purpose (to prove intent) was made prior to the introduction of such testimony.[21] *The government offered to prove intent to sell heroin by proving use of marihuana four times,*[22] the delivery of *bulk* marihuana once[23] (which the government states inferentially was a sale (Tr. 494)), and the sale of marihuana cigarettes twice.[24] The trial judge himself expressed doubts as to whether such evidence was admissible, even for the limited purpose of showing intent. As he said in hearing the motion to strike the evidence of previous possession and use and sale of marihuana: "There is a question in my mind whether handling and smoking marihuana is an act of a similar nature to handling heroin," or facilitating the transportation or sale of heroin.[25]

The government at the time of trial, and on this appeal, urges that because 21 U.S.C. § 174 covers the sale, importation and transportation of heroin (or any narcotic drug), and provides a five to twenty year imprisonment and $20,000 fine; and because 21 U.S.C. § 176a covers the sale, importation and transportation of marihuana, with the same term of imprisonment and same fine, "the legislature saw no great distinction between the two," that "they carry the same penalties," (Tr. 495), and are therefore similar!

The fact that two separate sections are required indicates a difference between heroin and marihuana, and the fact that the penalties are similar is of no more consequence than the fact that one could be imprisoned for a similar term for robbing the mails. Similar punishments cannot make two crimes similar acts.

The appellee's brief gives us little help on this problem. It offers three cases citing the general rule: Enriquez v. United States, 9 Cir., 1951, 188 F.2d 313, 316; Nye & Nissen v. United States, 1949, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919; Sachs v. United States, 9 Cir., 1960, 281 F.2d 189, but these truly deal with similar acts. They each assume the similarity between the act charged with the antecedent act, and do not reach the real point here involved—whether the acts were in truth "similar."[26]

Strangely enough, the appellants' brief likewise offers us no help on this point. Not one case is cited by appellant in behalf of the claimed error.[27]

We need not pass with finality upon the integrity of Ramirez' testimony. That, as we have said, is primarily for the jury, secondarily for the trial judge, and rarely a matter for appellate court consideration. Yet we point out that the witness gave contradictory testimony which raised real doubts as to the details of his alleged observation of heroin on the one

20. Tr. 307, 308, 309.

21. Tr. 309.

22. Tr. 318, 321, 322-3, 323-4.

23. Tr. 326-7.

24. Tr. 327-8.

25. Tr. 485.

26. Nye & Nissen, supra, involved *false invoices,* six related to the substantive counts, eleven others the "similar" offenses. Enriquez v. United States, supra, involved "substantially identical" crimes, i. e., 21 U.S.C. § 174—narcotics. Sachs v. United States, supra, involved the charge of receiving photograph records stolen from interstate commerce. The similar offense was the receiving of other stolen photograph records, not proved to have been stolen from interstate commerce.

27. Appellants' Brief, Vol. II, pp. 134 to 141.

occasion he said he saw it at the store. On the first trial he testified:

> "Q. Did you open the package?
>
> "A. No." [28]

On the second trial he testified:

> "Q. Would you describe what you saw?
>
> "A. It wasn't packaged, wrapped in tissue paper, and I opened it up and it was a powder substance.[29] I I opened the end of the balloon up." [30]

Thus there were unusual discrepancies in the testimony of Ramirez at the two trials—

(a) as to the number of times he had seen heroin at the cabinet shop;

(b) as to whether he had opened the one package of heroin; and

(c) as to whether he was "mad", or wanted to get even with Franco.

One other point we think should be mentioned, because it was emphasized by the government in oral argument to the jury. That was a reference to Ramirez telling Franco that he was "mad" at him for not paying him $135.00, allegedly due as wages; Ramirez' admitted reply was: "Don't be surprised if anything happens," and Franco's alleged reply to Ramirez: "If anything happens, I am going to kill you." This was interpreted by the government in argument to be an attempt to suppress evidence.[31]

The obvious weakness in this argument is that the conversation between Franco and Ramirez (the Ramirez statement admitted by both and the counter-threat de-nied by Franco) took place, whatever was said, during early August of 1960,[32] over a month before any indictment was filed [33] against any defendant, and almost three months before Ramirez knew for the first time he might be a witness against Franco and Enriquez.[34]

When Ramirez was "picked up" by a representative of the United States Government, he was taken to the Federal Building, was fingerprinted and photographed with a "number," he was told he faced a possible five year term in the jail or penitentiary.[35] Admittedly his mind was "refreshed" [36] by Agent Maria reading to Ramirez his (Maria's) report of what had occurred three months before. At first Ramirez had not even remembered whether he had been in the Impala Chevrolet automobile on the critical date of August 2, 1960.[37] All of this adds up to a very untrustworthy witness, and yet, as the government stated to the jury in oral argument: "Unquestionably, his testimony [that of Ramirez] is the backbone of the case against the defendants."

The prosecutor then stated, in asking the jury to believe Ramirez:

> "It [Ramirez' testimony] has been corroborated from the lips of the defendants—and by that I am referring to the lips of Trigueros while he was in the car saying, 'Sleepy is the man we are getting it from,' by the actions observed of Enriquez and Franco during August the 2nd."

As we have seen—Maria did *not* so testify; he heard the words "connection" and "sleepy," as part of a conversation, but, if we may be pardoned for saying so,

28. Transcript, first trial, p. 276, *l.* 3. Later Ramirez said he saw *through* a balloon.

29. Tr. p. 333, *ll.* 17–19; pp. 361–362.

30. Tr. p. 363, *l.* 25.

31. "Raul Franco has attempted to suppress evidence * * * and I am talking about the threats to this now seventeen-year-old, but then sixteen-year-old witness, Augustine Ramirez * * *. You have to ask yourself the further question, why did he intend to suppress evidence? Why did he want to suppress

that evidence? And, of course, the obvious answer is because the evidence would convict him." (Tr. 675.)

32. Tr. 373.

33. Indictment, filed September 15, 1960.

34. This was on October 21, 1960; he testified at the first trial on October 27, 1960 (Tr. 387).

35. Tr. 388.

36. Tr. p. 157, *ll.* 9–11; pp. 393, 396–399; 402–404, 415.

37. Tr. 406–7.

there was no "connection" between the two words.

When we add to the untrustworthiness of the testimony of the principal witness against these appealing defendants the proof introduced as to *intent, i. e.,* the *use* of marihuana by defendants on several occasions before August 2, 1960, to prove a subsequent *sale* of heroin, plus the testimony of other purchases or attempted purchases of heroin from defendants previously convicted and not then on trial with the two appealing defendants,[38] under the theory of a conspiracy to be proved (without proof of any overt acts), we reach the firm and final belief that the appealing defendants did not have a proper trial, because inadmissible evidence on the issue of intent was permitted to be introduced which may have inflamed and influenced the jury in a weak case such as this.

While the statement refers to character evidence, we find the following quotation pertinent here:

"Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. [note] Not that the law invests the defendant with a presumption of good character, * * * but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; [note] on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." Michelson v. United States, 1948, 335 U.S. 469 at 475–476, 69 S.Ct. 213, at 218, 93 L.Ed. 168.

This court quoted the general rule in Sachs v. United States, supra, and touched on the difficulties in determining its exceptions, citing Johnston v. United States, 9 Cir., 1927, 22 F.2d 1, 5, certiorari denied, 276 U.S. 637, 48 S.Ct. 421, 72 L.Ed. 745, and quoting from it as follows:

" 'The general rule is unquestioned that, when a defendant is put on trial for one offense, evidence of a distinct offense unconnected with that laid in the indictment is not admissible. [Citations] While this is the general rule, the exceptions are so numerous that it has been said: "It is difficult to determine which is the more extensive, the *doctrine or the acknowledged exceptions.*" [Citations].' " Sachs v. United States, supra, 281 F.2d at 191.

We also announced the general rule (in Erwing v. United States, 1961, 296 F.2d 320 at 324) to be:

"The general rule prevailing in this circuit is that when a defendant is on trial for a specific offense evidence of a distinct offense unconnected with that charged in the indictment is inadmissible."

We then said:

"We are aware that many decisions of this and other circuits recognize many exceptions to this general rule. A study of many of the decisions which apply exceptions to the general rule reveals that whether the

38. (1) The purchase from Trigueros of heroin obtained through one Joe Farrell, using a red Valiant automobile (the alleged source of supply), on July 20, 1960.

(2) The *attempted* purchase through Trigueros and one Arnold of heroin on August 17th, 1960

(3) The attempted purchase from Trigueros of heroin on August 25th, 1960.

(4) The purchase from Trigueros of heroin (from the same source of supply as mentioned in (1) above) on August 26, 1960.

general rule or an exception thereto should be applied depends upon the facts and circumstances of each case. Our review of the record in the instant case convinces us that the general rule is applicable to the facts of this case." (Id. at 324–325.)

In our effort to find if the general rule, or the exception, is to be applicable under the facts of this case, we note that Wigmore and Wharton are relied on in Nye & Nissen v. United States, supra, (note 3, 336 U.S. p. 618, 69 S.Ct. p. 769).

Wharton's 12th Edition (1955) refers to the necessity that the prior act, offered to show intent, be "inseparably interwoven," (1:516, 523) but does not explain what is meant in law by that phrase. Wharton cites twenty types of crimes where proof of previous similar "inseparably interwoven" crimes might demonstrate intent, but a previous narcotics sale, or use or possession, is not one of these. (1:524–528.)

Wigmore states (3rd Ed., Vol. 2, p. 200, § 302): "*It is at least necessary that prior acts should be similar.* [emphasis added] Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the essence of this probative effect is the likeness of the instance." Cited in Wigmore's 1962 Supplement are: United States v. Stirone, 3 Cir., 1958, 262 F.2d 571 (extortion); United States v. Schiller, 2 Cir., 1952, 187 F.2d 572 (conspiracy to defraud); and United States v. Bridell,

N.D.Ill., 1960, 180 F.Supp. 268 (income tax evasion), none of which relate to our present problem.

We have examined many cases from this circuit, including those where no question as to lack of "similarity" arose,[39] and they are of no help to us on the peculiar facts here existing.

The only cases which seem in any degree to be in point are: Erwing v. United States, supra (cocaine); Teasley v. United States, 9 Cir., 1961, 292 F.2d 460, 466–467 (marihuana and heroin both found at the time of arrest); Anthony v. United States, 9 Cir., 1958, 256 F.2d 50, 53 (marihuana); and Wright v. United States, 9 Cir., 1951, 192 F.2d 595, 13 Alaska 513 (marihuana). But each (except for Teasley) involve precisely similar acts, and hence are not here controlling.

Under all the circumstances of this peculiar case, we hold the admission of the objected to evidence, with respect to prior *use* of marihuana, and the refusal of the court to strike it, constituted prejudicial error which deprived both Franco and Enriquez of a fair trial.

The judgments of conviction are reversed. The cause is remanded with instructions to dismiss as to the defendant Franco. Because of the question as to defendant Enriquez' constructive possession on the night of August 2, 1960, we remand his case with directions that he be granted a new trial.

39. Bush v. United States, 9 Cir., 1959, 267 F.2d 483, 489 (Mann Act); Enriquez v. United States, 9 Cir., 1951, 188 F.2d 313, 316 (opium); Smith v. United States, 9 Cir., 1949, 173 F.2d 181, 184–185 (armed robbery); Stein v. United States, 9 Cir., 1948, 166 F.2d 851, 855 (opium); Tedesco v. United States, 9 Cir., 1941, 118 F.2d 737 (Mann Act); United Cigar Whelan Stores Corp. v. United States, 9 Cir., 1940, 113 F.2d 340, 347 (sale of denatured alcohol used as a beverage); Shreve v. United States, 9 Cir., 1939, 103 F.2d 796, 803 (security sales).