**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Juan Gabriel DOZAL–BENCOMO, Defendant–Appellant.**

**No. 91–3066.**

United States Court of Appeals, Tenth Circuit.

Dec. 31, 1991.

Michael G. Christensen, Asst. U.S. Atty. (Lee Thompson, U.S. Atty., with him, on the brief), Wichita, Kan., for plaintiff-appellee.

Peter John Orsi, Wichita, Kan., for defendant-appellant.

Before HOLLOWAY, MOORE and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Defendant Juan Dozal–Bencomo (Dozal) was convicted in the United States District Court for the District of Kansas on five counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, one count of possession of heroin with intent to sell in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and one count of conspiracy to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. The sole issue in this appeal is whether entrapment, as a matter of law, exists.

Mr. Dozal appeals, claiming government agents induced him to commit the unlawful activity and the evidence produced at trial is insufficient as a matter of law to show he was predisposed to commit the offenses. The jury rejected defendant's entrapment defense and our review of the entire record convinces us the evidence clearly supports the verdicts. Accordingly, we affirm.

In February 1990, Mr. Dozal developed a friendship with a musician named Tony Fardella who agreed to help promote defendant's music career. Unbeknownst to Mr. Dozal, however, Mr. Fardella served as an informant for the Drug Enforcement Agency (DEA).[1] Mr. Fardella soon told the DEA about a conversation he had with Mr. Dozal where he inquired whether Mr. Dozal knew anyone willing to front him cocaine. Mr. Fardella testified that Mr. Dozal responded negatively, but indicated he was "trying to move some heroin."

Mr. Fardella took undercover DEA Agent Jim Woods to Mr. Dozal's home on April 12, 1990, to purchase some heroin. Agent Woods posed as a heroin dealer seeking a supply source for further distribution. When they first arrived Mr. Dozal was alone but stated he was waiting for a "very old friend." Shortly thereafter, a man named Reynaldo Rodrigez arrived.[2] During this first meeting Mr. Dozal made Agent Woods "swear to God that [he] was not a cop." Within two minutes of the encounter Mr. Dozal began negotiating the price of the heroin with Agent Woods, who was able to haggle the cost down from $2,300 to $2,200 per ounce. Agent Woods handed Mr. Rodrigez the money and he, in turn, handed the agent one ounce of brown Mexican heroin.

Before Agent Woods left, he and Mr. Dozal agreed on specific "code" words to use when describing heroin in future telephone conversations. Mr. Dozal also agreed the price for future heroin buys would drop to $2,100 per ounce. Mr. Rodrigez gave Mr. Dozal $60 for his services in this transaction.

Agent Woods telephoned Mr. Dozal three times to arrange purchases of heroin and Mr. Dozal invited him to his residence on at least one occasion. Transactions similar to the initial buy, but involving larger quantities of heroin, occurred at Mr. Dozal's residence on April 18, April 23, and again on April 30, 1990. All three times, Mr. Rodrigez handed Agent Woods heroin in exchange for cash. Mr. Dozal was present at each deal and continued to negotiate the price with Agent Woods. He indicated if ten ounce shipments were purchased the price would drop to $1950 per ounce. At one point Agent Woods inquired whether Mr. Dozal would be interested in swapping

---

1. Mr. Fardella agreed to supply the DEA with names of individuals trafficking in narcotics after agents found three grams of marijuana in his home during a search for documents on an earlier date. The DEA also paid Mr. Fardella a total of $1,900 over a four month period, including $750 for his role in defendant's case. Mr. Fardella was never under a threat of prosecution for the marijuana found in his home since the DEA never had a "prosecutable case" according to agents who testified.

2. The reporter's spelling of "Rodrigez" differs from Appellant's version; the docket sheet also spells the name two different ways. The spelling used here mirrors that used in the indictment.

cocaine for heroin. Mr. Dozal responded by saying he would have to talk it over with Mr. Rodrigez.

Following the buy on April 30th, Agent Woods discovered he had been shorted nearly one quarter ounce of heroin. He telephoned Mr. Dozal four times about the shortage and met with him at his residence. Mr. Dozal assured the agent that Mr. Rodrigez would correct the deficiency and offered to pay for the shortage himself. Mr. Dozal was visibly upset since he thought he had been "followed" after the previous day's transaction and because Agent Woods had used the word "gram" over the telephone.

Agent Woods went to Mr. Dozal's residence again on Tuesday, May 8, 1990, this time to arrange purchase of six ounces of heroin. Mr. Dozal appeared "paranoid." Believing his house was bugged with transmitters, Mr. Dozal led the agent to a utility room he thought was safe. He searched Agent Woods for electronic transmitters and again made him swear he was not a law enforcement officer. Mr. Dozal then agreed the transaction with Mr. Rodrigez would take place the following day.

Agent Woods met both individuals at Mr. Dozal's house on Wednesday as planned. Mr. Dozal promptly went to the garage, returned with a cup and placed it in front of Mr. Rodrigez. Mr. Rodrigez pulled a baggie containing heroin out of the cup and tossed it to Agent Woods, saying "[t]hat's your shortage." Agent Woods weighed the plastic bag on electronic scales and Mr. Rodrigez handed him several more baggies containing six ounces of heroin. Agent Woods then stated he needed to go to his car to retrieve the $12,000. Mr. Dozal initially objected to the agent leaving the house with the heroin but then acquiesced, saying "go ahead and get the money and bring it back in." Agent Woods did not return. Instead, three other DEA agents entered the house and arrested the pair.

At trial, Mr. Dozal admitted the elements of the offenses but claimed the government entrapped him. A jury rejected the entrapment defense after a four day trial and the district court sentenced Mr. Dozal to five years imprisonment on each count, to run concurrently.

## DISCUSSION

Mr. Dozal contends the DEA initiated each of the illegal transactions and the government failed to show that he was predisposed to commit the offenses. In short, he argues the government brought forth no evidence other than his vulnerability to be "induced into the drug world by a mercenary." Mr. Dozal asserts "vulnerability" does not equate to predisposition and had the DEA not induced him to arrange the drug purchases he would have remained "a poor and struggling, but law abiding, musician."

Of immediate importance, Mr. Dozal asserts that whether sufficient evidence exists to constitute a triable issue of entrapment is a question of law, reviewable de novo by the Court of Appeals. While this statement is technically correct on its face, Mr. Dozal misconstrues its applicability to the present situation.

■ For example, much of the support cited by Mr. Dozal goes to the threshold inquiry of whether the trial court should allow an entrapment defense in the first instance; it bears little relevance to the proper standard of review this court should accord a jury's findings of fact on the issue. Here, the trial court delivered, without objection, nearly the identical entrapment instruction requested by Mr. Dozal's counsel. Because the trial court submitted the entrapment defense to the jury essentially as requested by Mr. Dozal, we need not consider whether a triable issue of entrapment exists.

■ However, we have examined Mr. Dozal's claim that the evidence supports a finding of entrapment as a matter of law. We "may find entrapment as a matter of law if the evidence satisfying the essential elements of entrapment is 'uncontradicted.'" *United States v. Price*, 945 F.2d 331, 332 (10th Cir.1991) (citations omitted). In other words, entrapment as a matter of law exists " 'only when there is undisputed testimony which shows conclusively and

**1250**

unmistakably that an otherwise innocent person was induced to commit the act.'" *United States v. Fadel,* 844 F.2d 1425, 1434 (10th Cir.1988) (quoting *United States v. Gurule,* 522 F.2d 20 (10th Cir.1975), *cert. denied,* 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976)). Our search of the record reveals sufficient disputed testimony arose at trial to preclude a finding that Mr. Dozal was entrapped as a matter of law. For instance, Mr. Dozal's testimony contradicts Mr. Fardella's assertion that the defendant, not the DEA, actively sought out a buyer for heroin. This confutation alone forestalls the need for further inquiry.

■ Defendant carries a heavy burden in attempting to persuade an appellate court he has been entrapped as a matter of law, and for good reason. Where a properly instructed jury considers the entrapment defense, the matter becomes so intertwined with the issue of intent and so "typically based upon credibility determinations, [that it remains] an area traditionally reserved for jury resolution." *Fadel,* 844 F.2d at 1430; *see also United States v. Riles,* 928 F.2d 339, 342 (10th Cir.1991) ("Entrapment is an affirmative defense, which bears on the question whether a defendant is guilty of the crime charged ... [and] can only be resolved by trial of the general issue." (Citations omitted.)); *United States v. Sullivan,* 919 F.2d 1403, 1418 (10th Cir.1990) (when the trial court is convinced a genuine issue of entrapment exists, the matter becomes a question of fact for the jury). We generally will not supplant our judgment for that of the fact finder where it has resolved the matter. The fact finder is traditionally in the best position to evaluate the evidence and determine credibility. Here, especially, the jury not only observed the testimony of the witnesses, but also heard the taped recordings of the actual meetings between Agent Woods and Mr. Dozal. Because the jury held as a matter of fact that Mr. Dozal was not entrapped into distributing heroin, "it would be anomalous for us to now hold that there was entrapment as a matter of law." *Price,* 945 F.2d at 332. Such a determination that entrapment was established as a matter of law can, however, be made in circumstances where the holding should be made without choosing between conflicting witnesses nor judging credibility. *Sherman v. United States,* 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) (entrapment held established from undisputed testimony of prosecution witnesses). Such is not the case here.

Accordingly, we review only whether sufficient evidence exists to support the jury's verdict. *See United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). A single test applies, whether the evidence relied upon is direct or circumstantial. The evidence, "together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* We have examined the entire record and find the evidence sufficient to sustain Mr. Dozal's convictions.

■ The purpose underlying the entrapment defense is to protect an otherwise unpredisposed individual from government coercion. *United States v. Ortiz,* 804 F.2d 1161, 1165 (10th Cir.1986). The critical inquiry in entrapment, therefore, focuses on defendant's intent or predisposition to commit the offense rather than the degree of government involvement. *See Hampton v. United States,* 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *Fadel,* 844 F.2d at 1433; *Ortiz,* 804 F.2d at 1165. Only when the government deceives the defendant in such a way as to "actually implant[ ] the criminal design" in the defendant's mind does entrapment come into play. *Hampton,* 425 U.S. at 489, 96 S.Ct. at 1649. The central question, therefore, is whether the criminal intent originated with the defendant or with the government agents. *Ortiz,* 804 F.2d at 1165.

■ "Predisposition" is defined as a defendant's inclination, willingness or readiness to engage in the illegal activity for which he has been charged. *Ortiz,* 804 F.2d at 1165. Here, the focus centers on

the defendant's state of mind before government agents suggest illegal activity. *Id.* Predisposition may arise from direct evidence of defendant's prior involvement in the illegal activity, *id.*, or may be inferred from "defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation." *Fadel*, 844 F.2d at 1433. Suffice it to say, "a defendant asserting an entrapment defense opens himself to a 'searching inquiry.'" *Id.* (citation omitted).

■ At the outset, we find the distinction between vulnerability and predisposition a matter of degree, not kind. The point at which an otherwise innocent person succumbs to an inherent willingness to participate in unlawful behavior, therefore, remains largely a factual issue. The record here indicates Mr. Dozal's role in the sale of heroin was significant. The evidence, taken as a whole, reveals Mr. Dozal as a willing and cooperative middleman in five heroin transactions, not the unwilling dupe he would have us believe.

First, the evidence shows Mr. Dozal desired to profit from the transactions. He received $60 for his role the first exchange and a total of $200 for all five transactions. Agent Woods testified that after his arrest Mr. Dozal told him he was just trying to make some money and he did not see anything wrong with selling heroin. "It wasn't like I was killing anyone," Agent Woods quoted Mr. Dozal as saying. Additionally, Mr. Dozal admits on appeal that "[t]o get Fardella to help him with his music career, he started looking for somebody to front Fardella cocaine." All this evidence represents an indicia of profit motive.

Likewise, Mr. Dozal displayed an eagerness to participate in the heroin transactions, which relates directly to the issue of predisposition. According to a government witness it was Mr. Dozal, not the DEA, who first suggested he had heroin to sell. Later, Mr. Dozal actively located Mr. Rodrigez as the supplier. He arranged the initial meeting between Mr. Rodrigez and Mr. Fardella to discuss drugs at a restaurant where he performed and later arranged a similar meeting between Mr. Rodrigez and Agent Woods at his residence. In all, he hosted five separate heroin transactions in his home and served as the primary negotiator of the price.

Similarly, Mr. Dozal was quick to respond to the undercover agents' inquiries about purchasing drugs. He told Mr. Fardella at their initial introduction he was trying to move some heroin and asked if he was interested. He also admitted attempting to find a cocaine source for Fardella. Again, a jury could properly consider this evidence as to Mr. Dozal's predisposition.

Mr. Dozal also demonstrated substantial knowledge of the drug trade and the evidence strongly implicates him in the illicit activity. For instance, Mr. Dozal inquired whether Agent Woods was a law enforcement officer on several occasions and once searched him for a transmitter. He was acutely aware of the prevailing prices of heroin and openly negotiated the price with Agent Woods. Mr. Dozal also arranged to speak in code and conducted several transactions in his utility room where he thought it was safe from electronic bugs. He offered to pay Agent Woods for the shortage that occurred during the second buy on April 30. He became upset and paranoid when Agent Woods used the word "gram" on the telephone. Finally, on the morning of the arrest, it was Mr. Dozal who initially insisted Agent Woods not leave the house with the heroin until he turned over the $12,000. In the final analysis, all of this evidence is consistent with a predisposition to take part in the sale of heroin.

However, Mr. Dozal still insists that agents induced him to participate in the narcotics trade and the government failed to show any prior history of his involvement in drugs. Mr. Dozal's arguments have little merit.

■ "Inducement" is defined as "'government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit

the offense.'" *Sullivan*, 919 F.2d at 1418 (quoting *Ortiz*, 804 F.2d at 1165). Therefore, our inquiry focuses on whether the defendant stood eager or reluctant to participate in the charged criminal conduct. *Ortiz*, 804 F.2d at 1165. Inducement may take the form of " ' "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." ' " *Sullivan*, 919 F.2d at 1418 (quoting *Ortiz*, 804 F.2d at 1165). Evidence that a government agent approached, solicited or requested the defendant "to engage in criminal conduct, standing alone, is insufficient to constitute inducement." *Ortiz*, 804 F.2d at 1165. Nor will inducement arise from evidence the government initiated the contact, *id.*, or assisted in the unlawful activity, *Fadel*, 844 F.2d at 1433. It is also well established that in narcotics enforcement, officers may employ appropriate artifice and deception to uncover illicit activities. *United States v. Jobe*, 487 F.2d 268, 270 (10th Cir.1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). Merely providing a person "ready and willing to violate the law" an opportunity to engage in the illegal acts is not entrapment. *Id.*

In short, entrapment is a "relatively limited defense." *Fadel*, 844 F.2d at 1429 (quoting *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973)). Just as an accused seeking to raise the defense need only produce sufficient evidence to create a factual issue, *id.* at 1430, the government need only generate "sufficient independent evidence of predisposition ... to present a jury question," *id.* at 1434. The burden is not upon the government to produce absolute proof of predisposition, but rather it need only convince a jury beyond a reasonable doubt the criminal intent originated with the defendant. *Ortiz*, 804 F.2d at 1165. Furthermore, in rebutting an entrapment defense, "the government is not required to show that the defendant has engaged in prior acts or prior violations of the narcotics laws." *Fadel*, 844 F.2d at 1433.

Sufficient evidence appears in this record to find Mr. Dozal was a ready and willing participant in the sale of heroin, particularly where he initiated the heroin deals by asking the government informant if he was interested in purchasing heroin. Hence, it was Mr. Dozal, not the DEA, who planted the seed for the illegal activity.

AFFIRMED.