UNITED STATES of America,
Plaintiff–Appellee,

v.

Ray MARTINEZ; Edgar Buezo, a/k/a
Edgar Martinez; Eloy Carranza; and
Rudy Rodriguez, Defendants–Appel-
lants.

Nos. 91–2286 to 91–2288 and 91–2298.

United States Court of Appeals,
Tenth Circuit.

Nov. 17, 1992.

Before MOORE, LAY,* and ANDERSON, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This is a consolidated appeal by defendants Edgar Buezo, Rudy Rodriguez, Ray Martinez, and Eloy Carranza from convictions for drug trafficking offenses, including conspiracy to distribute more than five kilograms of cocaine, 21 U.S.C. § 846, 18 U.S.C. § 2; possession with intent to distribute more than five kilograms of cocaine, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A); and use of a firearm during a drug trafficking crime, 18 U.S.C. § 924(c)(1) and § 2. Defendants present a number of issues, some jointly and some separately, which relate to theories of entrapment, joinder, instructions, admissibility of evidence, and sentencing.[1] After consideration of all the issues, we affirm the convictions.

The action arises from a Drug Enforcement Administration "sting operation" involving DEA agents in Chicago and Albuquerque and a confidential paid informant in New York City, known only by the assumed name of "Juan Carlos." The operation culminated with the arrests of the defendants in Albuquerque while they were attempting to consummate the sale of six kilograms of cocaine.

James D. Tierney, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., with him on the briefs), Albuquerque, N.M., for plaintiffs-appellees.

Richard J. Knowles, Albuquerque, N.M., on the brief, for defendant-appellant Ray Martinez.

Joseph N. Riggs III, Albuquerque, N.M., on the brief, for defendant-appellant Eloy Carranza.

Paul J. Kennedy, Albuquerque, N.M., for defendant-appellant Edgar Buezo.

Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, N.M., for defendant-appellant Rudy Rodriguez.

*The Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

### Disclosure of the Confidential Informant

A common issue raised by defendants Buezo, Martinez, and Rodriguez is their defense of entrapment. Mr. Buezo claims he was directly ensnared by Juan Carlos, and the other two argue they were "vicariously" entrapped. Without the disclosure of the confidential informant, defendants maintain their defense of entrapment was undermined.

Defendants contend the district court erred by failing to require the government to disclose the true identity of Juan Carlos and produce him at trial for cross-examina-

1. Mr. Carranza and Mr. Martinez have submitted their cases on the briefs.

tion. We review this issue under an abuse of discretion standard. *United States v. Moralez*, 908 F.2d 565, 567 (10th Cir.1990).

The Supreme Court has articulated a balancing test for revealing confidential informants in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957):

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege [of secrecy] must give way.
>
> . . . .
>
> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. *Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.*

*Id.* at 60–62, 77 S.Ct. at 627–29 (emphasis added). We have described this balancing of interests more recently in *Moralez*, 908 F.2d 565.

> [C]ases involving confidential informants fall into several broad categories. At one extreme are the cases where the informant is a mere tipster, and disclosure is not required. At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial. In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

*Id.* at 568 (citations omitted).

In *United States v. Mendoza–Salgado*, 964 F.2d 993 (10th Cir.1992), we upheld the denial of disclosure even though the defendant asserted the testimony of the informant was critical to the defense of entrap-

ment, holding, "Where the value of the informer's testimony remains speculative at best, we cannot say the district court erred by denying disclosure of the informer's identity." *Id.* at 1001. To permit the trial court to make the required balancing test, we held in *Gaines v. Hess*, 662 F.2d 1364, 1369 (10th Cir.1981), an *in camera* hearing can be used to determine whether the informant's testimony would lend aid to the defense. A defendant seeking disclosure of the identity of a confidential informant has the burden of demonstrating a need for disclosure. *Roviaro*, 353 U.S. at 59, 77 S.Ct. at 627.

Defendant Buezo, contending the informant was the only person who could offer direct testimony about his entrapment defense, filed a pretrial motion in which he sought to compel the disclosure of Juan Carlos' identity and his presence at trial. The district court granted the motion and set an *in camera Gaines* hearing. Mr. Buezo subsequently filed a supplemental memorandum prior to the hearing in which these and other less significant reasons were advanced as justification for the examination of the confidential informant to establish his entrapment defense:

1) Juan Carlos initiated the first discussion with Mr. Buezo about the "cocaine business." Juan Carlos suggested they "open a nightclub in Albuquerque and import cocaine from New York using the nightclub as a distribution center."

2) At a later visit on another subject, Juan Carlos "again insistently turned the conversation to the matter of cocaine and the opening of a nightclub in Albuquerque to aid in the distribution of cocaine."

3) Juan Carlos was interested in the wholesale price of cocaine in Albuquerque and indicated if the price were right he and defendant could transport cocaine from Albuquerque and make a profit. "The defendant always replied that he did not know the prices of cocaine in Albuquerque nor did he know anything about the cocaine business."

4) Juan Carlos indicated he had a boss in Chicago with whom he had done business dealing in heroin.

5) Juan Carlos called defendant "consistently and insistently both in New York and in Albuquerque" to persuade defendant to engage in the cocaine business. Nevertheless, defendant "consistently" attempted to avoid these contacts and refused the overtures to engage in drug trafficking.

6) "Juan Carlos was particular to the Defendant as to how to operate a drug distribution business." Juan Carlos insisted a person in defendant's position could successfully distribute cocaine through a nightclub.

7) When defendant returned to New York in the autumn of 1989 for the funeral of his mother, Juan Carlos again "spoke consistently about the Defendant's necessity of entering the cocaine business."

8) Juan Carlos used his common background with defendant as a persuasive tool to gain defendant's confidence in an attempt to involve defendant in the drug trade. Phone conversations between them continued to the day before the charged transaction took place. "The details of the deal were intimately negotiated between the Defendant and Juan Carlos."

9) Juan Carlos is "an able and experienced informant for the government."

10) Juan Carlos is "a very smooth and articulate talker capable of engendering trust through conversations...."

At the *in camera* hearing, among other facts, the court's questioning of Juan Carlos established:

1) During the first meeting between Juan Carlos and Mr. Buezo, defendant "started asking me for—for one-eighth of a kilogram of cocaine.... He asked me for that, if I can supply him. And I said, 'Probably in the future,' That's all." Juan Carlos stated at the time of this conversation he was " 'a government informant' " having engaged in that act following conviction of possessing a pound of cocaine with intent to distribute." [2]

2) After Juan Carlos stated he was unable to deliver a kilogram of cocaine, "He give [sic] me his home number, you know, his in New York, I think his father's number. And then also, he asked me for my beeper number."

3) After this first meeting, defendant started calling Juan Carlos on his beeper, and they became friends. They talked about opening a "clothing business." He added, "All—when he used to go to New York, he come over to our car service ... and he said, 'If I'm—you know, If I have somebody who want to buy marijuana.' And I said, 'I might have a friend, but no [sic] this time.' "

4) Juan Carlos had fifteen to twenty telephone conversations with the defendant but none between June to September. "And then when he told me that he has a friend—friends who can supply in Albuquerque a lot [sic] amount of cocaine. So I decided to start and call him lot [sic]." Those calls started in December or January. He called defendant at his old number, and after defendant changed numbers, at a new number given him by Mr. Buezo as well as defendant's beeper number.

5) Juan Carlos tried to get defendant to "do business" with Humberto Flores, an undercover DEA agent in Chicago, but defendant replied, "No, we can't do any business with Chicago. If you want to do any business, have [sic] to be in Albuquerque."

6) When asked directly whether he had "at any time indicated to him that you wanted him to get into the drug business," Juan Carlos said, "No." When later asked, "Did you at any time suggest to him that he should get in the cocaine business," Juan Carlos replied, "No, never, never." Once again, after inquiry into many other facets of the activities between the two

---

**2.** While it is not clear from the affidavit whether defendant's assertion of the verbal dexterity of Juan Carlos referred to his fluency in Spanish or English, it is painfully clear from the transcript of the *in camera* hearing that Juan Carlos is virtually inarticulate in English. Indeed, his entire testimony is very difficult to follow because it tends to be rambling and disjointed. At least in English Juan Carlos is anything but a "smooth and articulate talker."

men, the court asked, "Well, did you at any time approach him about getting into the drug business, and did you at any time ever bring it up and say, 'You and I ought to get in the drug business.' or something like that?" The witness answered, "No, I didn't. No, I did not." Once again, after intervening testimony, the court stated, "But what you're telling me, then, is at no time did you ever try to induce him to get into the drug business?" Juan Carlos responded, "No, never. We never—I mean, I never brought it up with something, cause I was afraid—afraid if I do something, you know, it was going to involve my business, and you know, turn down my business, and I didn't want to do that."

7) On separate occasions, Juan Carlos told the court that his effort consisted of trying to get Mr. Buezo and Mr. Martinez to contact Humberto Flores in Chicago.

Following this testimony, the trial court entered an order denying disclosure of the informant. The order stated, in part, "none of his/her testimony will offer any assistance to the defendant."

From the *in camera* testimony, we must conclude not only was Juan Carlos unable to corroborate Mr. Buezo's theory of entrapment, but he also would have directly contradicted it. Moreover, Juan Carlos would have refuted defendants' testimony about the extent of Juan Carlos' participation in the illicit transaction. Our review of the record, then, leads us to further conclude defendants' arguments are without a factual foundation; the testimony of the confidential informant would have been of no assistance to the defendants and would not have lent any credence to their defense; the effect of his testimony on their defenses is speculative if not altogether nonexistent; and defendants' factual assumptions regarding the value of Juan Carlos' testimony are simply conjecture. Under these circumstances, it cannot be said the trial court erred by denying the motions to disclose and produce.

We reach the same conclusion regardless of the way each defendant addresses the issue of production of the informant or the benefit of his testimony. For example, Mr.

Buezo believes Juan Carlos was more than a "mere tipster" and took an active role in the activities leading to Mr. Buezo's arrest. Consequently, defendant argues, "Juan Carlos' participation was extensive enough to raise the issue of entrapment." Mr. Martinez contends he became embroiled in the transaction only because Juan Carlos had entrapped Mr. Buezo and afterward vicariously threatened him.

Mr. Rodriguez also spun an entrapment defense off that of Mr. Buezo and took the position that the testimony of the informant would be critical to his defense of entrapment. However, in neither his pretrial motion for disclosure nor his brief in this court was he able to articulate a basis for his contention other than speculation that the informant might be able to provide relevant testimony. Moreover, on appeal Mr. Rodriguez asserts the evidence which he might have been able to elicit from cross-examination of Juan Carlos related to "his activities and inducement to Buezo on behalf of the government and [sic] avoid prosecution." Mr. Rodriguez also contends, "[t]he testimony of 'Juan Carlos' would almost certainly have been favorable to the defendants' entrapment defense."

Unfortunately for the defendants, their postulations are not borne out by the *in camera* testimony. It is of no wonder, then, that the trial court denied their motions.

■ Defendants now maintain because Juan Carlos was more than a tipster, they should have had access to him. We do not view the requirement of disclosure so narrowly; that is, disclosure of an informant is not required simply because the informant has taken an active role in the criminal transaction.

■ The scales are tipped toward disclosure only when the combination of circumstances, including the charge, the possible defenses, the significance of the informant's testimony, and other relevant factors, dictates disclosure over secrecy. *Roviaro*, 353 U.S. at 62, 77 S.Ct. at 628; *Moralez*, 908 F.2d at 567. When, as here, the district court conducts an *in camera*

hearing which discloses the informant will directly controvert asserted defenses or, at least will provide no exculpatory information, the scale tips toward nondisclosure, regardless of the role played by the informant. When it is clear the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure. *United States v. Straughter*, 950 F.2d 1223, 1232 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1238, 117 L.Ed.2d 471 (1992).

Defendants argue they should have had the opportunity to question the informant to establish his bias and impeach his testimony. Defendants' argument again is essentially grounded in speculation. Our examination of the *in camera* evidence discloses nothing that would support the defendants' suggestion they could have impeached the informant, particularly when his testimony was not used in the first place. *See United States v. Curtis*, 965 F.2d 610, 614 (8th Cir.1992). Of equal importance, then, is the fact that Juan Carlos was not a declarant within the meaning of Fed.R.Evid. 806[3] and not subject to impeachment.

Mr. Rodriguez also cites testimony of government agents concerning statements made to them by Juan Carlos as a basis for needing impeaching evidence. The trial court, however, correctly held those statements were not hearsay declarations because they were not introduced for the purpose of establishing the truth of the matters asserted in the statements, but rather, for the purpose of explaining the conduct of the government agents. Thus, the court properly held the credibility of Juan Carlos could not be attacked under Fed.R.Evid. 806.

Mr. Rodriguez argues alternatively that he was entitled to impeach Juan Carlos because he was an "adversarial witness," citing *United States v. Moody*, 903 F.2d 321 (5th Cir.1990). The case provides him no solace, however, because it is easily distinguished. In contrast to this case, "[i]n its case-in-chief, the government relied extensively upon the inculpatory hearsay remarks of ... nontestifying declarants to impute Moody's alleged intentional and knowing participation in the fraud." *Id.* at 327. Given the trial court's correct assessment of the nature of the testimony in this case, we see no error in its protection of the identity of the informant from disclosure by means of an irrelevant demand for impeaching material.

### *Entrapment as a Matter of Law*

 Mr. Buezo contends we should conclude, as a matter of law, that he was entrapped, citing *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir.1986). Entrapment exists as a matter of law only if the evidence of entrapment is uncontradicted. *United States v. Dozal–Bencomo*, 952 F.2d 1246, 1249 (10th Cir.1991). When a jury has found that no entrapment existed, we can alter that finding on legal grounds only "where the holding should be made without choosing between conflicting witnesses nor judging credibility.... Accordingly, we review only whether sufficient evidence exists to support the jury's verdict." *Id.* at 1250.

Mr. Buezo asserts the government has failed to provide any evidence of his predisposition; therefore, as a matter of law, he was entrapped. He predicates this assertion upon the argument Juan Carlos was the only person who could testify to Mr. Buezo's predisposition, but because he was not present at trial that evidence was not introduced.

---

**3.** Rule 806 states:

When a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

We considered the identical argument in *United States v. Gurule*, 522 F.2d 20, 23–25 (10th Cir.1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976), and held even without the testimony of the confidential informant there may be a sufficient conflict in the evidence to make predisposition a jury question. We said even though the government did not produce direct evidence rebutting the defendant's testimony of his lack of predisposition, the jury is entitled to disbelieve the defendant and conclude he was not entrapped. *Id.* at 24. *See also United States v. Johnson*, 495 F.2d 242, 244 (10th Cir.1974). Moreover, even without the testimony of Juan Carlos, the jury was presented evidence which put into issue Mr. Buezo's predisposition.

Viewed in a light most favorable to the government, that evidence showed Mr. Buezo was not the innocent neophyte to the drug trade that he portrayed himself to be. For example, in a surreptitiously recorded conversation with undercover DEA agent Humberto Flores, who was posing as a buyer of large quantities of cocaine and marijuana, Mr. Buezo recounted an experience he had traveling with a large quantity of marijuana. He stated while driving a truck load of "grass" to New York, he was stopped by police because his license plate was dirty. He told agent Flores he was not suspected because "I didn't give them a motive." Mr. Buezo also advised agent Flores about the price of marijuana in New York City and the price of cocaine in Albuquerque. Later, in that same conversation, he discussed the details of the sale of twenty-five to fifty kilograms of cocaine. Mr. Buezo then stated, "about two weeks ago" he had transported "four hundred, three hundred and seventy five pounds" of marijuana to New York and made a profit of "three hundred [dollars] on a pound." In a subsequent conversation with agent Flores, Mr. Buezo said, cocaine deals were nothing new to him and he had "done it [cocaine transactions] in New York many times." He added he had sold cocaine in New York for "thirty-three a key." There were other conversations in which similar statements were made by Mr. Buezo indicating his

knowledge and experience in the drug trade. These statements and his testimony relating to his lack of predisposition put the issue in controversy for the jury. Accordingly, we must conclude defendant's legal theory is without foundation, and he is not entitled to a holding he was entrapped as a matter of law simply because Juan Carlos did not testify.

Finally, Mr. Buezo claims his case is "strikingly similar" to *Jacobson v. United States*, — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), which underscores his entitlement to reversal. Like the defendant in *Jacobson*, Mr. Buezo contends he was subjected to a continuous effort to convince him to violate the law; thus, his conviction should be set aside as the consequence of a concerted government scheme to entrap him. That bald assertion of fact notwithstanding, we find a marked contrast between *Jacobson* and this case.

In *Jacobson*, the government's case presented no controversy over the extent of the governmental activity leading to the arrest of the defendant. Indeed, the government rested its case upon the lengthy prearrest conduct of its agents, and it was that testimony which led the Supreme Court to conclude the government had "overstepped the line." The prosecution's case demonstrated a period of two and one-half years of "repeated efforts by two Government agencies, through five fictitious organizations and a bogus pen pal, to explore petitioner's willingness to break the new law by ordering sexually explicit photographs of children through the mail." — U.S. at —, 112 S.Ct. at 1538. In contrast, the only evidence in *Jacobson* of predisposition offered by the government was a single purchase of two magazines at the time the purchase was legal. There is simply no parallel here, and *Jacobson* provides defendant with no support for his theory that he was entrapped as a matter of law.

### *Severance*

Defendants Martinez and Carranza argue the district court erred by denying defendants' motions for separate trials. We review the district court's decision to

deny such motions under an abuse of discretion standard. *United States v. Peveto,* 881 F.2d 844, 857 (10th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).

Severance may be necessary when codefendants produce mutually exclusive defenses. "[T]he conflict between co-defendants 'must be so intense that there is a danger the jury will unjustifiably infer from the conflict alone that both defendants are guilty.'" *Id.* at 857 (quoting *United States v. Esch,* 832 F.2d 531, 538 (10th Cir.1987), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 (1988)). "A mere conflict of theories or one defendant's attempt to cast blame on another does not require severance." 881 F.2d at 857 (citing *United States v. McClure,* 734 F.2d 484, 488 (10th Cir.1984)). When one defendant admits some or all of the elements of the charge, the danger a defendant will be denied a fair trial is exacerbated. *Peveto,* 881 F.2d at 858.

■ In this case, three defendants admitted most, if not all, the elements of the charges against them, relying upon their entrapment defenses. Only Mr. Carranza, who claims to have been merely present at the scene of the transaction, has denied any role in the conspiracy. Now, defendants Martinez and Carranza argue that their defenses placed them in conflict with each other and the other defendants. Although defendants asserted *different* defenses, those defenses were not *antagonistic.* We therefore conclude they have not met the test prescribed in *Esch.*

Mr. Martinez' defense of entrapment certainly does not exclude Mr. Carranza's defense of innocence; therefore, their defenses are not antagonistic by definition. In no way does the assertion of one defense dictate the guilt of the other codefendant. *See United States v. Smith,* 788 F.2d 663, 668 (10th Cir.1986). Defendants nonetheless urge the trial posture produced an unfair result.

■ Mr. Martinez argues codefendants' counsel undermined his entrapment defense because they tried to depict him as a dangerous drug dealer as part of the entrapment defense of their clients. Mr. Martinez argues this tactic put the jury in the position of having to disbelieve his defense if it believed that of the other defendants. Mr. Martinez, however, does not cite to any portion of the record where this phenomenon occurred.

He does, however, refer to the consequence of the cross-examination of Ramona Garcia. Ms. Garcia, the girlfriend of defendant Rodriguez, had been indicted with the others but pled guilty and testified as a government witness. While her testimony may have been unfavorable to defendants Martinez and Carranza, it certainly was not given as a codefendant asserting an antagonistic defense. Thus, even though defendants sought severance following Ms. Garcia's appearance, her testimony did not provide grounds upon which that motion should have been granted.

We conclude the defendants did not assert antagonistic defenses and that any conflict between them was merely a conflict in theories. The district court did not err in denying the motions for severance.

### Motion for Mistrial

■ Defendant Carranza attacks the issue of severance from an additional posture, arguing the district court erred by not granting his motion for mistrial because of the antagonistic positions taken by the defendants. We review denial of motions for mistrial under an abuse of discretion standard. *United States v. Novak,* 918 F.2d 107, 108 (10th Cir.1990).

Mr. Carranza asserts because he made repeated motions for severance, the district court erred in not granting his motion for a mistrial. The grounds he argued for this motion were the same as those advanced in support of his motion for severance. Given our review of that motion, we cannot say the trial court abused its discretion in denying a mistrial. *See Ortiz,* 804 F.2d at 1164 n. 2 (Abuse of discretion occurs when the trial court makes a clear error of judgment or exceeds the bounds of permissible choice.).

### Tendered Instruction on "Vicarious Entrapment"

Mr. Rodriguez contends even though he had no direct contact with Juan Carlos or the undercover governmental agents, threats made by these people compelled him to become involved in the cocaine transaction. Thus, he argues, he was the victim of vicarious entrapment.

In support of this characterization, Mr. Rodriguez asserts he became involved in the offense when his girlfriend, Ms. Garcia, who had been thrust into the role of overseeing the transaction and checking the money for the supplier of the cocaine, told him she was fearful for herself and her children. However, Mr. Rodriguez and Ms. Garcia testified he took her place to assuage her fears, although both admitted they had not been directly threatened by either Juan Carlos or the government agent.

The focus of his vicarious entrapment defense is: but for the criminal design implanted in the mind of Mr. Buezo and the threats arising out of Mr. Buezo's subsequent activities, Mr. Rodriguez would never have been involved in the crime. Using this theory as a platform, Mr. Rodriguez contends, despite the court's instruction on entrapment generally, he was entitled to an instruction on vicarious entrapment because it was his theory of the case.

A defendant is entitled to a theory of the case instruction, but only if the theory is supported by the law and the facts in evidence. *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir.1985). We conclude Mr. Rodriguez' theory is not supported by law.

We are among the majority of Circuits that have not recognized the defense of vicarious or derivative entrapment. *Holloway v. United States*, 432 F.2d 775, 776 (10th Cir.1970) (there must be some showing of conduct by government agents which has induced the accused to commit the charged offense). *See also United States v. Marren*, 890 F.2d 924, 931 (7th

Cir.1989); *United States v. North*, 746 F.2d 627, 630 (9th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985); *United States v. Mers*, 701 F.2d 1321, 1340 (11th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 482, 78 L.Ed.2d 679 (1983); *United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983); *United States v. Dove*, 629 F.2d 325, 329 (4th Cir.1980); *United States v. Burkley*, 591 F.2d 903, 911 n. 15 (D.C.Cir.1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979); *United States v. Garcia*, 546 F.2d 613, 615 (5th Cir.), *cert. denied*, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977); *Whiting v. United States*, 321 F.2d 72, 76 (1st Cir.), *cert. denied*, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963); *Beard v. United States*, 59 F.2d 940, 941 (8th Cir.1932). These Circuits maintain, in essence, the purpose behind the entrapment defense is to prohibit the government from directly involving an otherwise disinterested and disinclined person from committing a criminal offense.[4] When the government has no contact with the accused, that purpose has no relevance; therefore, without direct government communication with the defendant, there is no basis for the entrapment defense. We adhere to that position. The district court did not err in refusing Mr. Rodriguez' vicarious entrapment instruction.

### Admission of Cocaine Found in Mr. Rodriguez' Wallet

When Mr. Rodriguez was arrested, his possessions were taken and inventoried. Found in his wallet was a packet containing .46 grams of cocaine. The trial court, over the objection of the defendant, received evidence of this discovery. The defendant now argues the evidence was improperly admitted under Fed.R.Evid. 404(b) because the government failed to demonstrate its relevance, citing *United States v. Jefferson*, 925 F.2d 1242, 1258 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 238, 116 L.Ed.2d 194 (1991). He asserts because the quantity of cocaine in his possession

---

**4.** *See United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir.1986) (citing *Lopez v. United States*, 373 U.S. 427, 434–35, 83 S.Ct. 1381, 1387, 10 L.Ed.2d 462 (1963)).

was so small, it could not be probative of his intent to distribute; hence, its only value was to prejudice the defendant in the minds of the jury.

As the government notes, however, the value of the evidence is its bearing upon Mr. Rodriguez' entrapment defense. To help establish his lack of predisposition, Mr. Rodriguez testified he never used cocaine. The evidence of his possession of a quantity consistent with use belies that testimony and puts his credibility in controversy. An entrapment defense opens a defendant to a "searching inquiry." *United States v. Mendoza–Salgado,* 964 F.2d at 1003. Any evidence which reflects upon his veracity is certainly relevant to that inquiry. We believe, therefore, the relevancy of the evidence was established.

Defendant cites two Ninth Circuit cases in support of his argument, *United States v. Bramble,* 641 F.2d 681, 682–83 (9th Cir. 1981), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 493, 74 L.Ed.2d 635 (1982), and *Enriquez v. United States,* 314 F.2d 703 (9th Cir.1963). In both cases, the court held proof of defendant's possession of marijuana was not relevant to the charges of distribution of cocaine and heroin. The attenuation in the evidence found by the court in those cases is simply not present here.

### Lesser Included Offense Instruction

██ Mr. Rodriguez argues the trial court should have submitted an instruction on simple possession as a lesser included offense of possession with intent to distribute. In *United States v. Joe,* 831 F.2d 218, 219 (10th Cir.1987), *cert. denied,* 484 U.S. 1072, 108 S.Ct. 1043, 98 L.Ed.2d 1006 (1988), we established a four-part test for submitting an instruction on a lesser included offense:

(1) [there has been] a proper request; (2) the lesser-included-offense must consist of some, but not all, of the elements of the offense charged; (3) the elements differentiating the two offenses must be a matter in dispute; and (4) a jury must be able to rationally convict the defendant of the lesser offense and acquit of the greater offense.

To be entitled to the instruction, a defendant must establish each of the four parts. *Id.*

Although the government concedes the defendant has met parts one, two, and three, it contends the defendant has failed to establish part four of the test. Because of his entrapment defense, Mr. Rodriguez essentially admitted the elements of the charged offense, seeking only to bar conviction on the grounds of invited conduct. We cannot, therefore, conclude a rational jury could have acquitted him on the charged offense and still have convicted him on simple possession.

Because entrapment is a complete defense, *United States v. McLernon,* 746 F.2d 1098, 1109–10 (6th Cir.1984), the jury's acquittal on the charged offense would not have permitted it to consider the lesser offense. Moreover, if the jury did not accept the entrapment defense, it was bound to convict on the charged offense in light of Mr. Rodriguez' admissions.

In reality, Mr. Rodriguez is contending he should have been granted an instruction that would have permitted jury nullification. He asserts that had the jury received a simple possession instruction, it could have accepted his entrapment defense and acquitted him of possession with intent to distribute; then, because he admitted the possession of the small quantity of cocaine, it could still convict him of criminal conduct.

This form of leniency is not the purpose of a lesser included offense instruction. Absent the rationality required by the fourth part of the *Joe* test, a defendant is not entitled to such an instruction just because it will have a lenient effect.

### Sentence Enhancement

Mr. Rodriguez was charged with, but acquitted of, possessing a firearm in connection with a drug trafficking offense. He contends it was therefore improper for the trial court to have enhanced his sentence under U.S.S.G. § 2D1.1(b)(1) which provides a two-level increase for possessing a firearm. We have already decided that issue to the contrary in *United States v.*

*Coleman,* 947 F.2d 1424, 1429 (10th Cir. 1991). Defendant admits the issue is foreclosed to this panel but asserts *Coleman*'s holding should be reviewed by the en banc court. That resolution must be left to another day. *United States v. Splawn,* 963 F.2d 295, 297 (10th Cir.1992) (A three judge panel cannot overrule Circuit precedent.).

We have considered the remaining issues and conclude they are rendered meritless by our holdings here. Accordingly, the judgments of the district court are AFFIRMED.