**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jorge Zamudio MADRIGAL,
Defendant–Appellant.**

No. 93–4115.

United States Court of Appeals,
Tenth Circuit.

Dec. 28, 1994.

Dixon D. Hindley, Salt Lake City, UT, for defendant-appellant.

Bruce C. Lubeck, Asst. U.S. Atty., and Scott M. Matheson, Jr., U.S. Atty., Salt Lake City, UT, for plaintiff-appellee.

Before LOGAN and HENRY, Circuit Judges, and BROWN, District Judge.[*]

HENRY, Circuit Judge.

Defendant-appellant Jorge Zamudio Madrigal appeals his jury conviction for aiding and abetting in the possession of a controlled substance with the intent to distribute under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Mr. Madrigal alleges that he was entrapped as a matter of law, and was therefore entitled to a judgment of acquittal. Alternatively, he argues that the evidence presented at trial was insufficient to prove his predisposition to commit the offense beyond a reasonable doubt, and that the jury therefore unreasonably rejected the entrapment defense. Mr. Madrigal also alleges that the district court abused its discretion by refusing to propound his proposed questions during voir dire. For the reasons stated below, we affirm the judgment of the district court in all respects.

## BACKGROUND

The evidence supports the following account of events: In 1990, Miguel Vasquez, a Mexican citizen with a ten-year permit to live in the United States, began working as a confidential informant to a police department in Utah. Mr. Vasquez did not have a criminal record. He testified at trial that he became a confidential informant because he was concerned that people in his neighborhood might have been trying to sell drugs to his children.

Mr. Madrigal was acquainted with Mr. Vasquez and, apparently because Mr. Vas-

---

[*] The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

quez had a reputation in his neighborhood as a drug dealer, Mr. Madrigal approached him several times in May and June of 1992 stating that he wanted to make money in the illegal drug market. Mr. Vasquez testified at trial that he never asked Mr. Madrigal to get drugs for him and that it was Mr. Madrigal who first broached the subject. Mr. Vasquez reported to Officer Thomas Breen regarding Mr. Madrigal's overtures, and Officer Breen monitored the case.

In June, Mr. Madrigal stated to Mr. Vasquez that he had a connection in California from whom he could purchase cocaine. The two men then agreed that Mr. Madrigal would go to California to purchase at least five kilograms of cocaine for Mr. Vasquez. Mr. Vasquez reported this to Officer Breen, who gave Mr. Vasquez $175 to give to Mr. Madrigal for his bus fare to California.

In July, Mr. Madrigal traveled to California and purchased seven kilograms of cocaine. Subsequently, he called Mr. Vasquez and arranged a meeting for the purchase of the cocaine upon his return to Utah. Mr. Vasquez notified Officer Breen that the exchange was to take place, and arranged to have the police follow Mr. Vasquez to the drug deal and monitor the transaction through the use of a one-way transmitter. Mr. Madrigal and Mr. Vasquez met the next day, along with other of Mr. Madrigal's associates. Once Mr. Vasquez saw the cocaine, he made it known to the police officers, and the men were arrested.

At his trial, Mr. Madrigal submitted twenty questions for the court to propound to the venire during jury selection. Although the trial judge discussed the subject matter of the proposed questions with the panel, Mr. Madrigal's specific submissions were denied.

Mr. Madrigal was convicted by the jury and moved for a judgment of acquittal, arguing that he had been entrapped as a matter of law and that, in any event, the evidence presented at trial was insufficient for the jury to reject the entrapment defense.

## ENTRAPMENT

■ At the outset we note that there are two elements of the entrapment defense: the defendant must have been induced to commit the offense by government agents, and the defendant must not have been otherwise predisposed to do so when presented with the opportunity. *United States v. Fadel*, 844 F.2d 1425, 1429 (10th Cir.1988). "Only when the government deceives the defendant in such a way as to 'actually implant[ ] the criminal design' in the defendant's mind does entrapment come into play." *United States v. Dozal–Bencomo*, 952 F.2d 1246, 1250 (10th Cir.1991) (quoting *Hampton v. United States*, 425 U.S. 484, 489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976)) (alteration in original). "Once a credible entrapment defense is raised, the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant was not entrapped." *United States v. Young*, 954 F.2d 614, 616 (10th Cir.1992). Because the purpose of the defense is to protect an otherwise unpredisposed individual from government coercion, the defendant's predisposition to commit the offense is the central inquiry. *Dozal–Bencomo*, 952 F.2d at 1250.

### Entrapment as a Matter of Law

Mr. Madrigal first alleges that the district court should have granted his motion for judgment of acquittal because he was entrapped as a matter of law. "We review a district court's denial of a motion for judgment of acquittal viewing all the evidence and drawing all reasonable inferences in the light most favorable to the prosecution." *Young*, 954 F.2d at 616.

■ Although entrapment is generally a question reserved for the factfinder's determination, *Mathews v. U.S.*, 485 U.S. 58, 63, 108 S.Ct. at 886–87, (1988) the court may find entrapment as a matter of law in very limited circumstances. Entrapment as a matter of law exists " 'when there is undisputed testimony which shows conclusively and unmistakably that an otherwise innocent person was induced to commit the act.' " *Fadel*, 844 F.2d at 1434 (quoting *United States v. Gurule*, 522 F.2d 20, 23 (10th Cir.1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976)). Consequently, conflicting evidence as to the defendant's predisposition to commit the crime precludes a finding

of entrapment as a matter of law "[b]ecause the factfinder is traditionally in the better position to evaluate conflicting evidence and determine credibility...." *United States v. Mendoza–Salgado,* 964 F.2d 993, 1002 (10th Cir.1992). This deference to the factfinder is particularly important in the context of the entrapment defense because the determination "becomes so intertwined with the issue of intent and so 'typically based upon credibility determinations.'" *Dozal–Bencomo,* 952 F.2d at 1250.

■ Mr. Madrigal argues that he was entrapped as a matter of law because there was testimony in the record that would tend to indicate that he was induced by Mr. Vasquez to commit the crime and that he was not predisposed to do so. Specifically, he points to Mr. Madrigal's own testimony that Mr. Vasquez suggested the person in California with whom he should deal, and that he resisted involvement in the scheme and did so only because he was coerced by Mr. Vasquez. However, there was ample testimony at trial that contradicted Mr. Madrigal and tended to support the view that he was predisposed to commit the crime. For example, Mr. Vasquez testified that Mr. Madrigal initiated the scheme, that Mr. Vasquez never asked if he could buy drugs from him, and that Mr. Madrigal suggested the contacts in California. Given the conflicting evidence in this case, we cannot say that Mr. Madrigal was entrapped as a matter of law.

Mr. Madrigal argues, however, that because "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime," *Jacobson v. U.S.,* 503 U.S. 540, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992), "government agents may solicit only those engaged in ongoing criminal activity or those having an immediate disposition to commit an offense." Brief of Appellant at 7. He argues that he was therefore entrapped as a matter of law because there was uncontradicted testimony that he had never previously been involved in drug dealings and because three months passed between the government's initial contact with him and the commission of the offense. *Id.* at 7–9.

Mr. Madrigal is correct that "[t]he inquiry focuses on the defendant's state of mind *prior* to the time government agents suggest the illegal activity." *Mendoza–Salgado,* 964 F.2d at 1002 (emphasis added). However, evidence that the defendant has not heretofore been involved in criminal activity is not dispositive. *Young,* 954 F.2d at 617; *Fadel,* 844 F.2d at 1433. Neither is the fact that three months passed between initial government contact and consummation of the crime. *See, e.g., Mathews v. United States,* 485 U.S. 58, 60–61, 108 S.Ct. 883, 885–86, 99 L.Ed.2d 54 (1988) (two months); *Sherman v. United States,* 356 U.S. 369, 371, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958) (three months); *Mendoza–Salgado,* 964 F.2d at 997–1000 (ten weeks); *Young,* 954 F.2d at 615–16 (over four months); *Dozal–Bencomo,* 952 F.2d at 1248–49 (three months). Rather, many factors may indicate a defendant's predisposition: "a showing of a defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation." *Fadel,* 844 F.2d at 1433. Evidence of Mr. Madrigal's prior history and evidence that three months passed before he committed a crime might tend to indicate a lack of predisposition, but as we have already stated, considerable contradictory evidence tended to show that he was predisposed. Consequently, we cannot say that he was entrapped as a matter of law.

### Sufficiency of the Evidence

■ Mr. Madrigal argues that even if the entrapment defense was properly submitted to the jury, the government failed to introduce evidence sufficient for the jury to find beyond a reasonable doubt that he was predisposed to commit the crime. "The evidence, 'together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" *Dozal–Bencomo,* 952 F.2d at 1250 (quoting *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986)).

As we noted previously, the government introduced evidence at trial that Mr. Madrigal initiated contact with Mr. Vasquez and set up the California contacts. Resolving all credibility issues in the government's favor, a reasonable jury could have found beyond a reasonable doubt that Mr. Madrigal was not entrapped.

## VOIR DIRE

Mr. Madrigal also contends that the district court abused its discretion by not propounding his proposed questions [1] to the venire during jury selection. During voir dire the court asked several questions aimed at determining whether any members of the venire might be prejudiced against Mr. Madrigal because of his Hispanic heritage.[2] Subsequently, Mr. Madrigal requested that the court propound his proposed questions regarding racial bias to the venire. The court denied Mr. Madrigal's request, stating that the questions were too open-ended, that the issues had already been adequately covered in voir dire, and that the questions might serve to suggest that racial bias would be a factor if the jurors convicted Mr. Madrigal.[3]

1. Mr. Madrigal proposed 20 additional questions. The first eight were intended to elicit responses regarding potential prejudice by members of the venire:

   Defense requested voire [sic] dire:
   1. What is the first thing that comes into your mind when you hear the word "Mexican"?
   2. How many Mexican people do you know that you would consider freinds [sic]? What is it about your relationship with them that makes you consider them freinds [sic] of yours?
   3. How many Mexican people who do not speak English do you know who you consider freinds [sic]?
   4. Have you ever been prejudged or labled [sic] because of you ethnic background, your religion, your skin color or your sex? How did that make you feel?
   5. Have you ever felt prejudiced [sic] or labeled because of anything about yourself? How did it make you feel?
   6. Have you ever been in a foreign country where no one spoke your language? How did that make you feel?
   7. What adjectives or descriptive words would you use to describe this defendant to your spouse or to your freind [sic]?
   8. Do you speak any foreign languages? If so which ones?
   Defense Requested Voire [sic] Dire, Brief of Appellant, Attachment at 1–2.

2. Specifically, the court stated:

   I want to again generally ask the question: Is there anything about your background and what little you know about this case that would possibly cause you to be less than fair and impartial in evaluating this case? And it is an important question and it obviously goes to the root of why we are here, to make sure there is not anything in your background that would make you prejudiced against this case, against this defendant, against this subject matter, or so strongly the other way that you couldn't be fair. . . .
   . . . .

   Do any of you have any prior association with the Hispanic community in a way that may make you either be biased in favor of Mr. Madrigal or prejudiced against him? And, of course, no one wants to think that we are prejudiced in any way, but if there is some incident in your past or something in your past that makes you feel that you might either be strongly biased one way or the other against Mr. Madrigal or in his favor because of his Hispanic background, we would like to know that too, and that is important to us to make sure we have a fair jury. I don't see any indication of that.
   Do any of you speak the Spanish language? Do any of you understand the Spanish language when you hear it spoken? I don't see any indication of that.
   Rec. supp. vol. I, at 42–43.

3. The following exchange took place:
   THE COURT: All right. First of all, any additional voir dire you want me to ask?
   MR. HINDLEY: I would like you to go into the Mexican questions on voir dire a little bit more.
   THE COURT: I looked at those. Which ones in particular? . . .
   MR. HINDLEY: Frankly, all of them. I prefer open-ended kinds of questions rather than the kinds of questions that you asked. I don't see how they can respond to it favorably with that kind of question. They are not going to say [they are] prejudiced.
   THE COURT: Well, they may say I am biased, I think that the Hispanic community has had poor treatment by us for years and I think I would be biased in their favor, and I think it was asked [during voir dire] both ways. But to ask them some of these questions about how many Mexican friends [they] have and so forth, I really am going to decline to do that.
   MR. HINDLEY: Okay. Does that apply to all of the questions on that?
   THE COURT: Well—
   MR. HINDLEY: What is the first thing that comes to your mind when you hear the word Mexican?

Fed.R.Crim.P. 24(a) governs the parties' rights with respect to voir dire. The rule reads:

> The court may permit the defendant or the defendant's attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or the defendant's attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

Fed.R.Crim.P. 24(a).

Although the practice of trial judges differs as to whether counsel is permitted to participate, "[t]he scope of voir dire examination is a matter within the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of discretion." *United States v. Espinosa*, 771 F.2d 1382, 1405 (10th Cir.), *cert. denied*, 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985). The Supreme Court has noted that "[d]espite its importance, the adequacy of *voir dire* is not easily subject to appellate review." *Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). This deference to the district court is appropriate for precisely the same reasons we owe the jury deference with regard to findings of fact: "Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." *Id.*

In *Rosales–Lopez*, the Supreme Court delineated the circumstances that mandate an inquiry into racial prejudice during voir dire. The Court held that a district court must make such an inquiry "only where the cir-cumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might ... influence[ ] the jury." *Id.* at 191, 101 S.Ct. at 1636.

■ We need not decide whether this case presents such a situation, however, since the district court *did* inquire into potential racial bias. The district court inquired into the potential jurors' prior associations with the Hispanic community, directly asked them whether they might be prejudiced either in favor or against Mr. Madrigal because of his background, and inquired into their knowledge of the Spanish language.

This court has previously held that refusal to propound proposed questions to the venire does not constitute an abuse of discretion when the court inquires into the proposed subject matter in its own questions. *See Espinosa*, 771 F.2d at 1405 & n. 30. Further, in denying the request, the district court in this case specifically expressed concern that Mr. Madrigal's proposed questions might actually serve to raise the defendant's race as an issue in the case. Given the fact that the district court inquired into racial bias and articulated sound reasons for denying the defendant's request, we find that the district court did not abuse its discretion.

The judgment of the district court is accordingly AFFIRMED.

THE COURT: I think it would open up a can of worms. We would have everybody responding to that, 34 people—
MR. HINDLEY: Perhaps not everyone but perhaps you might ask the entire panel and then ask two or three people or just pick two or three people and ask just to get a general—
THE COURT: I think if I asked I would have to ask everyone and I don't think it gets us anywhere.

MR. HINDLEY: Well, number four then, and that is have you ever been prejudiced [sic] or labeled because of your ethnic background, religion, skin color or sex, and how did that make you feel? It goes right to the same point.
THE COURT: I guess I don't see it as neutral. I think it is suggesting to them that prejudice may be a factor if they convict this individual. I don't like it.
Rec. supp. vol. I, at 44–45.