**UNITED STATES COURT OF APPEALS**
**Filed 9/20/96**
**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DESMOND ALEXANDER BIRCH,

Defendant - Appellant.

No. 95-1484
(D. Colo.)
(D.Ct. No. 94-CR-357)

---

**ORDER AND JUDGMENT**[*]

---

Before TACHA, BALDOCK, and EBEL, Circuit Judges.

---

A grand jury indicted defendant Desmond Birch on twelve counts of violating the securities laws pursuant to 15 U.S.C. §§ 78j(b), 78ff; 18 U.S.C. § 2; and 17 C.F.R. § 240.10b-5. The defendant moved for a judgment of acquittal at the close of the government's case, at the close of the evidence, and at the sentencing hearing. The district court denied each request. The jury convicted the defendant on all twelve counts. Pursuant to U.S.S.G. § 2F1.1, the court sentenced the defendant to concurrent sentences of thirty months for each count

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

and to a term of supervised release of two years. The court determined that the appropriate base offense level under § 2F1.1(a) was six. The court then departed upward by two levels for more than minimal planning under § 2F1.1(b)(2) and by eleven levels based on an estimated loss of more than $800,000 pursuant to § 2F1.1(b)(1)(L).

The defendant now appeals on two grounds. First, the defendant asserts that the trial court erred in denying his motion for judgment of acquittal. Second, he contends that his sentence should be recalculated downward to reflect the net loss to the victims and to reflect a disjunctive jury instruction. We reject the defendant's arguments and affirm.

## I.    BACKGROUND

On September 15, 1983, James Gilmore and Birch entered into a "distributorship agreement" in which Birch agreed to raise money Gilmore needed to develop an innovative fuel system. In exchange for raising the needed money, Birch obtained limited "marketing rights" to market the system once it was developed. Birch raised money by creating three limited partnerships and selling interests in his marketing rights to other investors. The sale of these marketing rights to twelve individuals was the subject of his securities fraud conviction.

From the outset of his talks with investors, Birch promoted the system as though its marketability was imminent. For example, he advised the investors

that major auto companies were interested in the pump. He told them that their money was urgently needed for research and development of the product. In fact, Birch had learned from technicians, mechanics, and engineers that no marketable project would be forthcoming.

Birch prepared a derivative purchase interest agreement for his investors. Paragraph 9.H of the agreement stated that Birch "may or may not" use the proceeds for his "personal expenses." Paragraph 5.A provided that Birch could keep up to 20% of proceeds for his own personal needs. That paragraph also provided that Birch would not convert any investor money for his personal use unless he had the prior approval of "a two-thirds majority in interest of all the Holders of Interest in the Granted Rights, including his own interest." Birch, however, failed to disclose that under his interpretation of the contract, he already had all of the approval he needed to use investor money for his personal expenses.

When asked about these contract provisions, Birch gave a number of responses to his investors. For example, he told one investor not to be concerned about paragraph 5.A because her money could only be used on the project since Birch had already used 20% of the proceeds. He told another investor that paragraph 9.H related only to traveling expenses to promote the project.

Contrary to his oral and written representations, Birch kept most of the investors' money to support himself. For example, from January 15, 1989 to

September 15, 1990, Birch raised $995,000 by selling his marketing rights in the project. Roughly one-third of these funds went to project expenses while the rest went to Birch's personal expenses.

## II.    DISCUSSION

### A.    Judgment of Acquittal

We review the denial of a motion for judgment of acquittal using the same standard as the trial court. United States v. Fleming, 19 F.3d 1325, 1328 (10th Cir.), cert. denied, 115 S. Ct. 93 (1994). In order to conclude that the evidence was insufficient, the court must find that no reasonable juror could have reached the disputed verdict. United States v. Ivy, 83 F.3d 1266, 1284 (10th Cir. 1996). We must view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution. United States v. Madrigal, 43 F.3d 1367, 1369 (10th Cir. 1994), cert. denied, 115 S. Ct. 1808 (1995).

After reviewing the record, we find that the evidence permitted a reasonable jury to find that the defendant defrauded a number of investors through the use of an ambiguous contract. Contrary to the defendant's arguments, this is not a simple contract dispute case. This is a case of fraud. Birch solicited over a million dollars from investors by telling them that their money would buy marketing rights in a viable and imminently marketable product. At the time Birch made these representations to investors, he knew the rights he sold them

were worthless. Instead of using the investors' money for the final research and development as he promised, he deposited their money in his own personal bank account. Based on all of the evidence, we find that a reasonable jury could have concluded that the defendant defrauded the investors who purchased securities.

**B.    Sentencing**

The defendant challenges the trial court's loss calculation used to determine his sentence on two grounds. First, he argues that the loss figure should have been offset by the "value" of the marketing shares that the victims received. Second, he argues that the district court erred in considering other relevant conduct in the loss computation. We review the trial court's factual findings supporting calculation of loss under the clearly erroneous standard. United States v. Lyons, 992 F.2d 1029, 1032 (10th Cir. 1993). We review the court's interpretation of the sentencing guidelines de novo. Id.

**1.    Offset**

The defendant contends that the district court should have offset the loss figure by the value of the marketing shares that the victims retained. The record, however, reveals a significant amount of evidence both at trial and at sentencing establishing that the "pump" was not a marketable product. Thus, we conclude that the trial court was not clearly erroneous in concluding that the shares had no fair market value. Accordingly, we hold that the trial court's determination of the

estimated loss to the victims of $828,000 was not clear error.

## 2. Other Relevant Conduct

The court instructed the jury that the defendant could be found guilty of securities fraud if he committed a general scheme to defraud (with a loss calculation of $828,000) or twelve individual acts of fraud against each of the victims named in the indictment (with a loss calculation of $128,000). The defendant argues that because the instruction was in the disjunctive, the district court could not have determined upon which ground the jury found him guilty. Thus, the defendant argues that he should receive the benefit of the lesser loss calculation.

The defendant's reliance on a disjunctive jury instruction is misplaced. Under the Sentencing Guidelines, a court may look to "relevant conduct" when sentencing a defendant. U.S.S.G. § 1B1.3. Section 1B1.3(a)(3) includes in its purview "all harm that resulted from the acts and omissions specified in [the Guideline], and all harm that was the object of such acts and omissions." Relevant conduct may include conduct for which defendant was not convicted. See United States v. Underwood, 982 F.2d 426, 429 (10th Cir. 1992), cert. denied, 113 S. Ct. 3043 (1993).

When the government seeks to increase a defendant's base offense level, it must show that the relevant conduct justifying the increase occurred by a

preponderance of the evidence. United States v. Hagedorn, 38 F.3d 520, 522 (10th Cir. 1994). In addition to the trial evidence, the government introduced evidence indicating that the several individuals, other than the twelve named in the indictment, were defrauded by the defendant. In determining the amount of loss, the court reviewed bank accounts, answers to questionnaires, personal interviews with the victims, and evidence demonstrating the amounts the defendant diverted to his personal use. We conclude that the district court's consideration of all the conduct encompassed by the securities fraud in making its loss calculation was not clear error. The defendant's conviction and sentence are therefore AFFIRMED.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Circuit Judge